In the Matter of JANICE S. BIRNBAUM et al., Appellants, v SAUL I. BIRNBAUM, Respondent.

In the Matter of ILENE L. FLAUM, Appellant, v SAUL I. BIRNBAUM, Respondent, and JANICE S. BIRNBAUM, Appellant.

Fourth Department, May 23, 1986

### APPEARANCES OF COUNSEL

*Harris, Beach, Wilcox, Rubin & Levey (James M. Hartman* of counsel), for Janice S. Birnbaum, appellant.

*Fix, Spindelman, Turk, Himelein & Shukoff (Norman M. Spindelman* of counsel), for Ilene L. Flaum, appellant.

*Woods, Oviatt, Gilman, Sturman & Clarke (Percival D. Oviatt, Jr.,* of counsel), for Central Trust Company, appellant.

*Stroock & Stroock & Lavan* and *Traynor, Skehan & Marks (Thomas P. Puccio, Robert J. Zastrow* and *Burton N. Lipshie* of counsel), for Saul I. Birnbaum, respondent.

*MacKenzie, Smith, Lewis, Michell & Hughes (Carter H. Strickland* of counsel), for Jay B. Birnbaum.

**OPINION OF THE COURT**

DENMAN, J.

In these consolidated proceedings petitioners seek to remove and surcharge respondent Saul I. Birnbaum as coexecutor in the estate of his brother, decedent Bernard P. Birnbaum; to vacate a "Release and Discharge" pursuant to which certain estate assets were transferred to respondent; to impose a constructive trust for the benefit of the estate on a 36.4285% interest in a shopping center enterprise known as North Shore Mart; to compel an accounting of the estate's interest in that property and reconveyance to the estate; to impose punitive damages and a surcharge on respondent; and to disqualify him from receiving commissions. Petitioners appeal from a decree of the Surrogate which refused to set aside the "Release and Discharge" and to impose a constructive trust in favor of the estate on a 19.643% interest in North Shore Mart which was conveyed to respondent pursuant to that document and to order reconveyance of that interest. Respondent cross-appeals from so much of the same decree as imposed a constructive trust in favor of the estate on a 16.7855% interest in the same shopping center and ordered an accounting to determine its value. Petitioners also appeal from the Surrogate's denial of their requests to remove respondent as a fiduciary; to impose punitive damages; and to order respondent to forfeit all commissions.

We conclude that the Surrogate erred in failing to vacate the "Release and Discharge"; that he was correct in determining that decedent had purchased a 16.7855% interest in North Shore Mart and in imposing a constructive trust on that interest in favor of the estate; that a constructive trust should also be imposed on the 19.643% interest conveyed pursuant to the "Release and Discharge" and that petitioners are entitled to reconveyance of both of those interests after an accounting; and that it was a proper exercise of discretion for the Surrogate to decline to remove respondent permanently as coexecutor, to deny petitioners counsel fees, to refuse to impose punitive damages on respondent or to find that he had forfeited his commission and should be surcharged.

FACTUAL BACKGROUND

Bernard Birnbaum died of a self-inflicted gunshot wound in

February 1976. His wife, Janice, and brother, Saul, were named coexecutors of his will and cotrustees of his testamentary trusts. Bernard and Saul had been jointly engaged in extensive business ventures over the years. An affectionate and trusting relationship existed between Saul, on the one hand, and Janice and her two children, Jay Birnbaum and Ilene Flaum, on the other. That relationship deteriorated, however, when each side began to accuse the other of misappropriating and wasting estate assets. As a result of those accusations, which ripened into litigation, the Surrogate suspended both Janice and Saul as coexecutors and appointed Ilene Flaum and Central Trust Company as temporary coadministrators.

The primary issues on appeal require us to examine the circumstances surrounding two transactions, one occurring shortly before Bernard's death, the other occurring shortly after.

### PURCHASE OF THE FIRMAN INTERESTS

In 1974 the North Shore Mart shopping center was owned by a partnership in which Saul and Bernard each held a 19.643% interest. Saul began negotiating the purchase of three other partnership interests, referred to throughout these proceedings as the "Firman Group". Those interests totaled approximately 33.571%. Although negotiations were conducted by Saul, he communicated almost daily with Bernard and it is clear from their correspondence that Bernard was purchasing one half of the Firman Group interests. Negotiations resulted in a purchase arrangement providing for a buy-out price of $325,000 with approximately $60,000 down and the balance on promissory notes providing for semiannual installments of $25,000. In December 1974 Saul stated in a memo to Bernard that he anticipated a closing in February 1975 and asked Bernard to forward a check for $30,000 as Bernard's share of the $60,000 down payment. In that memo Saul stated, "[s]ince I have marked myself as the purchaser to avoid both of us being liable for the purchase price and having both our interests incumbered, your check should come to me to be transferred to [the Firman Group]." Bernard forwarded the check for $30,000. When the anticipated February closing did not take place, Bernard demanded return of his share of the down payment. In April 1975, Saul forwarded Bernard a check for $30,000, stating that the closing had been postponed

but that he was going to make the down payment directly from the North Shore Mart account.

The Firman Group purchase closed in June 1975. All of the documents indicate that Saul was the sole purchaser; however, they also include a specific provision permitting Saul to transfer a portion of his acquired interest to Bernard. The down payment and closing costs were made from undistributed funds in the North Shore Mart account which were equally due to Saul and Bernard. After the closing Saul's attorney drew up papers transferring one half of the interest purchased to Bernard. Those papers were signed by Saul in November and forwarded to Bernard who signed and returned them to Saul. In December 1975 the first installment of $25,000 became due on the note. That payment was made directly from undistributed funds in North Shore Mart which were due equally to Saul and Bernard. The balance of the undistributed funds, $499.95, was divided equally between Saul and Bernard. None of the documents drawn to equalize ownership between Saul and Bernard was ever filed or recorded. Bernard died in February 1976 and the full interest purchased from the Firman Group remained in Saul's name individually.

### THE "RELEASE AND DISCHARGE"

Throughout the litigation involving this estate, Saul has taken the position that at Bernard's death, Bernard owed Saul $746,828 on a "running account" between the brothers. That account was kept by Sidney Finger, who was Saul's accountant, and who, after Bernard's death, acted as accountant for the estate. In August 1976, only a few months after Bernard's death and while Janice and Saul still enjoyed an affectionate and trusting relationship, Saul presented Janice, Jay and Ilene with a "Release and Discharge" which recited that the estate owed Saul $365,382.09[1] representing money which Saul had loaned to decedent and, in partial reduction of that debt, authorized a transfer to Saul of the following assets: a 19.643% interest in North Shore Mart (the interest held by Bernard prior to the Firman Group purchase); a 25% interest in the Olympic Bowl; a 25% interest in a partnership owning two industrial buildings in New Jersey; and decedent's interest in a partnership owning property in Pennsauken, New

---

1. Although that is the amount stated in the release, a footnote indicates that it is an incomplete statement of the debt.

Jersey, and Huntington, Long Island. The document valued the 19+% interest in North Shore Mart at \$147,500. Saul takes the position that the "Release and Discharge", which, in addition to Janice, Jay and Ilene, was signed by Pauline Birnbaum, mother of Saul and Bernard,[2] represents an agreement by all beneficiaries of the two testamentary trusts and may not now be repudiated. Petitioners take the position that, in signing the document, they relied on Saul's representations as to the existence of the debt, the extent of the estate's interest in North Shore Mart, and the value of that interest.

### FINDINGS OF THE SURROGATE

Referring to the negotiations preceding the Firman Group buy out and the correspondence between the brothers relating thereto, the Surrogate found that the memoranda between Bernard and Saul presented a "clear and convincing indication of the proposition that the buy out was to be by Saul and Bernard in partnership." Relying additionally on the proof that the down payment, closing costs and first installment on the note were paid from funds owing equally to Bernard and Saul, the court concluded that the only opposing proof, testimony of Saul and the only other remaining North Shore partner, Lawrence Goldrich, to the effect that Bernard had withdrawn from the transaction, did not outweigh the "heavy and probative thread of documentary evidence". The court therefore imposed a constructive trust on the 16.7855% interest for the benefit of the estate and ordered an accounting to determine the value of the estate's present interest. The court concluded, however, that the passage of time made it inequitable to order a reconveyance and therefore provided that Saul could purchase the interest from the estate.

With respect to the "Release and Discharge", the findings of the Surrogate are somewhat inconsistent. The court found that Pauline, who had not been told that Bernard was dead and who could neither read nor write English, had not given an informed consent and that Saul had guided her hand in execution of the document. The court therefore found that the document was not valid as to her and directed her conservator to protect her interests.

With respect to the other beneficiaries, however, the court

---

2. Pauline Birnbaum died on April 5, 1986, subsequent to argument on appeal.

declined to examine the validity of the amount of the debt Saul claims against the estate, the values assigned by Saul to the real estate transferred to himself in payment of that debt, or the alleged misrepresentations which he made to the other beneficiaries. Although he found that Saul exerted pressure to have the document signed, he concluded that it did not reach the level of undue influence or coercion. Whereas the Surrogate found that Janice had trusted Saul implicitly and relied on everything he said with little question, he nevertheless concluded that Janice had the time and opportunity to consult the attorney for the estate, was an able business person and therefore signed as a competent and consenting adult. He found that Jay and Ilene also signed as competent adults. In response to petitioners' allegations that the value ascribed to the interest in North Shore Mart which Saul transferred to himself was so grossly understated as to constitute a material misrepresentation and that such transfer was in direct violation of SCPA 1805, the Surrogate concluded that any misrepresentation did not rise to the level of fraud and that since all beneficiaries had consented, it was not necessary to follow the strict mandate of section 1805.

### THE ESTATE IS ENTITLED TO ONE HALF OF THE INTEREST PURCHASED FROM THE FIRMAN GROUP

■ The record affords clear and convincing proof that Saul purchased the Firman Group interest on behalf of himself and Bernard in equal shares. We agree with the Surrogate that the record presents "a rather compelling thread of documentary evidence" that negotiations were carried out by Saul but that he purchased the interest as a nominee for himself and Bernard. The many pieces of correspondence between the brothers clearly contemplated that one half of the interest was to be transferred to Bernard after closing; the closing documents included a specific provision to enable a transfer from Saul to Bernard; the down payment, closing costs and first installment on the note were all paid from funds which belonged equally to Bernard and Saul. The only proof to the contrary was the testimony of Saul and Lawrence Goldrich to the effect that Bernard withdrew from the deal after closing. The Surrogate therefore properly found that respondent had appropriated decedent's interest in the Firman buy out and imposed a constructive trust on a 16.7855% interest in the North Shore Mart enterprise for the benefit of the estate.

### THE "RELEASE AND DISCHARGE" IS INVALID

■ Despite finding that Saul had misappropriated decedent's interest in the Firman purchase, the Surrogate did not inquire into the loan account balance which Saul claimed as a debt against the estate, the value he assigned to the properties which he transferred to himself or the general fairness of the transaction. Because Janice, Jay and Ilene are competent adults, and because they failed to prove either fraud or undue influence, he held the "Release and Discharge" to be valid as against them. In so finding, the Surrogate misapprehended the nature and extent of Saul's fiduciary duty and erroneously required petitioners to prove that Saul was guilty of fraud and/or undue influence.

One of the most stringent precepts in the law is that a fiduciary shall not engage in self-dealing and when he is so charged, his actions will be scrutinized most carefully. When a fiduciary engages in self-dealing, there is inevitably a conflict of interest: as fiduciary he is bound to secure the greatest advantage for the beneficiaries; yet to do so might work to his personal disadvantage. Because of the conflict inherent in such transaction, it is voidable by the beneficiaries unless they have consented. Even then, it is voidable if the fiduciary fails to disclose material facts which he knew or should have known, if he used the influence of his position to induce the consent or if the transaction was not in all respects fair and reasonable (II Scott, Trusts § 170, at 1298 [3d ed 1967]). These rules are equally applicable to the obtaining of a release by the fiduciary. "In the case of releases, as in other instances of dealing between a fiduciary and the person for whom he is acting, there must be proof of full disclosure by the trustee of the facts of the situation and the legal rights of the beneficiary, and there must be adequate consideration paid. In addition, the trustee must negative fraud by positive misrepresentation or concealment, or duress or undue influence, or by other unfairness." (Bogert, Trusts and Trustees § 943, at 475-478 [rev 2d ed 1982].) The mere absence of misrepresentation, fraud, or undue influence in the obtaining of a release is not sufficient to insulate the release from a subsequent attack by the beneficiaries; the fiduciary must affirmatively demonstrate that the beneficiaries were made aware of the nature and legal effect of the transaction in all its particulars. "[A]ny acquisition of the shares of the beneficiaries by one of the fiduciaries must be dealt with as presumptively void unless

affirmative proof is made by the fiduciaries that their dealings with each beneficiary was in every instance aboveboard and fully informative. The fiduciaries in such circumstances have the obligation to show affirmatively not only that they acted in good faith but that they volunteered to the beneficiaries every bit of information which personal inquiry by the beneficiaries would have disclosed." *(In re Rees' Estate,* 72 NYS2d 598, 599, *mod on other grounds* 277 App Div 839.)

In addition to these well-established principles, self-dealing by a fiduciary is specifically prohibited by statute. SCPA 1805 provides, in pertinent part, as follows: "1. A fiduciary shall not pay out of the property of the decedent any debt alleged to be owing to him by the decedent until proved and allowed by the court in the proceeding for the judicial settlement of his account." That statute is designed to insure that any claim against the estate by a fiduciary is carefully scrutinized by the court and makes it incumbent upon the fiduciary to prove that the debt is valid and that all beneficiaries are thoroughly informed of the surrounding circumstances as well as of their rights and remedies.

Examination of the "Release and Discharge" here in the light of those precepts makes clear that Saul completely failed to establish that any of the beneficiaries gave an informed consent to the transactions set forth therein. First, there was no proof of the validity of the debt claimed by Saul. He asserted that it was on a "running account" between Bernard and himself from 1955 to 1975. There was no proof as to the components of that debt and it is very likely that there would be defenses to some aspects of it, e.g., Statute of Limitations, yet no such disclosure was made to the beneficiaries. Second, it is undisputed that Saul prepared the release and sent it to Janice, Jay and Ilene for their signatures without explanation other than that which is contained in the release itself. Third, there is no question that Saul held the superior position vis-à-vis the other beneficiaries. The Surrogate found that, after Bernard's death and prior to commencement of litigation, "Saul was the undisputed patriarch of the extended Birnbaum family."

Saul claimed that because Janice had worked for her husband for many years dealing with various business matters, she should have been aware of the transactions contained in the release, particularly the North Shore Mart matter. Yet she testified that although she had handled general matters relating to real estate management such as rentals, repairs,

and maintenance requests, she did not know the extent of her husband's interest in North Shore or how much he had paid for it. Although the value for North Shore Mart has been listed on an estate tax return which she had signed, she testified that she did not analyze the return but relied on Sidney Finger, who was Saul's accountant, and the accountant for the estate and on Saul as they were the "experts". With respect to the release, she said that she would have signed no matter what was contained in the document because she relied on Saul for the accuracy of the statement. She did not seek the advice of the attorney for the estate because she did not think that it was necessary. According to his own testimony, Saul did not explain the document to Janice and in fact did not communicate with her on it at all, speaking only to Jay.

Jay testified that he was not aware that his father and Saul had ongoing negotiations involving the Firman interests. He testified that he didn't talk to anyone about the release because he didn't realize that he should have talked to someone. He signed because his uncle told him to sign and he took his directions from his uncle who was running the estate at that time.

Ilene Flaum, who was out of State at the time she signed, testified to having a warm and loving relationship with her uncle at that time, that she had no recollection of any circumstances surrounding her signing of the document and that no representations of any kind were made to her about it. She did not read the document sent by her uncle as she took it for granted that everything he sent her would be correct.

The testimony was thus clear and unrebutted that Saul made no explanations whatsoever as to the ramifications of the beneficiaries' signing the "Release and Discharge". He had assumed the dominant family role and the family looked to him for his advice and business acumen. They did not question his statement that Bernard owed him money or the valuation he placed on the properties he transferred to himself. He failed to inform them of any defenses the estate might have had to the debt he asserted and, most critically, did not inform them of the negotiations between him and Bernard to buy out the Firman interests. Although the release stated that it was to be filed with the Surrogate, the document was never filed.

The Surrogate found that, although Saul had exerted some

influence and was the dominant family member, and although the valuation attributed to North Shore Mart possibly fell short of a fair price, petitioners had not proved undue influence, fraud or misrepresentation. The Surrogate thus erroneously placed the burden on petitioners. The burden clearly is on the fiduciary to prove that the consent obtained from the beneficiaries was fully informed and given with an awareness of their rights and remedies. Saul fell far short of sustaining that burden. The release is therefore unenforceable and the conveyance of the estate's interest in the various properties to Saul must be voided.

Respondent relies primarily on two cases for the proposition that approval of the Surrogate (SCPA 1805) is not necessary when a fiduciary acquires estate property with the consent of the beneficiaries. In *Ledyard v Bull* (119 NY 62) the fiduciary was the son of decedent. He obtained the consent of the other beneficiaries, his four sisters, to payment of a debt owed by the decedent of $11,000, representing rental on property owned by the fiduciary and occupied by decedent. The payment was upheld because presumably the decedent's daughters knew whether he had in fact lived in the property owned by their brother and the approximate value of that rent. In *Matter of Ludlam* (283 App Div 1111, *appeal dismissed* 1 NY2d 854), the court approved payment to an executor acting as attorney for the other executors of a fee for his services out of the estate prior to a judicial accounting when all of the interested parties agreed on the value of the services and that they should be paid. Those cases are clearly distinguishable from the facts before us. Saul has failed to prove the validity of the estate's debt to him, the possibility of defenses to such debts have not been explored, the value of the properties have not been objectively established and the beneficiaries were not informed of the ramifications of their executing the release.

A CONSTRUCTIVE TRUST SHOULD BE IMPOSED
ON THE NORTH SHORE MART INTERESTS AND
THEY SHOULD BE RECONVEYED TO THE ESTATE

The Surrogate ordered that a constructive trust be imposed on the 16.7855% interest in North Shore Mart which he found Bernard had bought from the Firman Group. In view of our determination invalidating the "Release and Discharge," a constructive trust should also be imposed on the

19.643% interest conveyed under that instrument. The remedy of a constructive trust is peculiarly suited to circumstances in which a fiduciary has been guilty of self-dealing. "A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others" *(Meinhard v Salmon,* 249 NY 458, 467; Bogert, Trusts § 87 [5th ed 1973]).

Although the Surrogate found that Saul had misappropriated property belonging to the estate and ordered the imposition of a constructive trust, he refused to order a reconveyance. We conclude that was error and order that the North Shore Mart interests be reconveyed to the estate. "If the trustee has not resold the property, or has resold it to a person who is not a bona fide purchaser, the beneficiaries can insist upon a reconveyance of the property; and the trustee is accountable for any income received by him from the property, but is entitled to receive the amount which he paid for it, with interest, and, unless he was guilty of actual fraud, the value of all improvements made by him" (II Scott, Trusts § 170.2, at 1304-1305 [3d ed 1967]). Inasmuch as Saul has not conveyed the North Shore Mart interests to a bona fide purchaser, petitioners are entitled to imposition of a constructive trust and subsequent reconveyance. The matter must first be submitted to a Referee to assess the value of those interests and determine what adjustments are necessary to place the beneficiaries in the same position they would have been in had the misappropriation not occurred *(see, Matter of Rothko,* 84 Misc 2d 830, 875-876, *mod on other grounds* 56 AD2d 499, *affd* 43 NY2d 305; *see also,* Bogert, Trusts § 77, at 289-290 [5th ed 1973]).

### PETITIONERS' OTHER REQUESTS

Petitioners also urge that the Surrogate erred in not ordering that Saul be permanently removed as coexecutor; that he pay their attorney's fees; that he forfeit his commissions; that he be assessed punitive damages and be surcharged. All of those requests were denied without prejudice and we believe it was within the Surrogate's discretion to postpone action on those matters until a final determination of the several issues still to be litigated.

We note further that, in view of our disposition of the principal issues on appeal, we do not find it necessary to address the other claims raised.

Accordingly, the decree should be modified in accordance with this opinion and, as modified, affirmed.

CALLAHAN, J. P., DOERR, BOOMER and GREEN, JJ., concur.

Decree unanimously modified on the law, and, as modified, affirmed without costs, in accordance with opinion by Denman, J.