[660 NYS2d 714]

FRANCO DESIDERI, Respondent, v D. M. F. R. GROUP (USA) Co., Appellant.

First Department, July 3, 1997

## APPEARANCES OF COUNSEL

*Jordan W. Siev* of counsel, New York City *(Kristen M. Eriksson* on the brief; *Anderson Kill & Olick, P. C.,* attorneys), for respondent.

*David Zaslowsky* of counsel, New York City *(Baker & Mc-Kenzie,* attorneys), for appellant.

## OPINION OF THE COURT

WALLACH, J.

At a closing in March 1990, defendant, an Italian investment entity whose principal was Mario Catelli, purchased 85% of the common stock of Reich & Co., a New York City brokerage corporation, with plaintiff acting as one of the buyer's agents and advisers. Following this acquisition, plaintiff entered into an employment contract whereby he was to serve as chief executive officer (CEO) of Reich and chairman of its board of directors. Plaintiff held these positions until about March 6, 1991, when he voluntarily resigned from Reich in an agreement signed by the employer and the parties hereto. Simultaneously, plaintiff and defendant executed and exchanged general releases mutually absolving each other from all liability in the most expansive boilerplate terms possible. Catelli signed the release on behalf of defendant. In February 1992, almost two years after the original stock purchase and about 11 months after plaintiff's resignation, defendant purchased the remaining 15% of the common shares of Reich.

Based on "rumors" that he and defendant had been defrauded in the Reich acquisition and that plaintiff had been part of the fraudulent scheme, Catelli made unsuccessful attempts in March 1992 to obtain relief in arbitration. Four months later, plaintiff commenced this preemptive action for a declaratory judgment that he had committed no fraud, and that, in any event, his release should be held and declared to be a complete bar to any claim against him by defendant. In its answer, defendant asserted a $3 million counterclaim sounding in fraud, breach of fiduciary duty and commercial bribery. After plaintiff served his reply, both parties moved for summary judgment.

The IAS Court entered an order declaring the release valid and a complete bar to the counterclaims, emphasizing that the release was clear and unambiguous, and that it did not fall within that narrow class of cases where the release itself (as opposed to the cause of action released) was obtained through fraud, duress, illegality, or mistake, citing *Fleming v Ponziani* (24 NY2d 105) and *Skluth v United Merchants & Mfrs.* (163 AD2d 104).

On appeal to this Court, the focus of the legal arguments has shifted. Defendant now urges that at all times prior to the

delivery of the release, plaintiff had a fiduciary relationship with defendant, first as an agent for Catelli and his company, and then as the CEO and director of Reich. In all these capacities, it is suggested, plaintiff was bound to disclose his wrongdoing in advance of delivery before the release could be unconditionally upheld, citing, *inter alia*, *Matter of Birnbaum v Birnbaum* (117 AD2d 409), *Insurance. Co. v Whitlock* (216 App Div 78) and *Federbush v Federbush* (88 NYS2d 185). Plaintiff responds with authorities seemingly to the contrary (*K3 Equip. Corp. v Kintner*, 233 AD2d 556, 557, citing *Mergler v Crystal Props. Assocs.*, 179 AD2d 177, 180).

It is not easy to reconcile these conflicting authorities, which in the end may rest simply on the varying equitable considerations presented by the particulars of each case. We find it unnecessary, however, to address plaintiff's fiduciary status in relation to the validity of his release, for the following reasons:

Entirely apart from the release issue, our independent examination of the record satisfies us that defendant has failed to establish the existence of a fraud cause of action against plaintiff. In order to sustain such a cause of action, there must be proof of five essential elements, viz., (i) a material misrepresentation of fact, (ii) made with knowledge of its falsity, (iii) with the intent to deceive, (iv) justifiable reliance and (v) damages. (*Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403, 406-407; *Lanzi v Brooks*, 54 AD2d 1057, 1058, *affd* 43 NY2d 778.) This record is remarkable by the insufficient showing of *any* of these requisite elements.

The difficulty begins with the pleading of fraud in the counterclaim itself. The relevant allegations consist of the following two paragraphs:

"26. As a result of the bribe, Desideri intentionally misrepresented to DMFR and its shareholders the value and business prospects of Reich.

"27. Desideri's actions in accepting the bribe and then convincing DMFR to purchase Reich, knowing that DMFR would rely on his advice and consequently pay an unjustifiably high price for Reich, constitute a fraud against DMFR."

This pleading is clearly deficient in that the facts constituting the fraud are not "stated in detail" (CPLR 3016 [b]). But because this is a motion for summary judgment that searches the record, we turn to defendant's sworn statements for a possible cure to the pleading defect.

In a three-page affidavit, Catelli relates his company's purchase of majority interest in Reich in 1990, pursuant to written agreement,* and plaintiff's subsequent employment agreement with the newly acquired Reich to serve as its Chairman of the board and chief executive officer, positions he held until his resignation nearly a year later, when mutual general releases were exchanged between the parties. Catelli further states that "In late 1992, approximately one and one-half years after I executed the Release, I for the first time heard rumors about fraudulent acts committed by Mr. Desideri and others in connection with DMFR's purchase of Reich." It was not until late January 1993 that Catelli was able to locate a person with actual knowledge of the bribes paid in connection with the sale of the Reich stock. He identifies this witness as Roger Franklin, whose deposition must have been somewhat of a disappointment to Catelli, since he was not a material witness to very much (through no fault of his own). Franklin described his role in the actual negotiations as nil. His connection with the transaction was that of a finder on behalf of the seller and its chief executive, Jay Reich. Franklin was happy that he had been paid "approximately $122,000" for his finder services, but somewhat unhappy that he was still owed a balance of more than $70,000. Although he did not attend any of the meetings, Franklin described how he had posted himself outside the meeting room, catching an occasional glimpse of his employer, Reich, whose mood appeared to vacillate between hope and despair during the course of the negotiations. At one point, Reich told him that the deal could not go through because a "second finder's fee" of about $700,000 to $800,000 was being demanded by someone else on behalf of the buyers. Franklin was not worried since Reich had assured him that his fee was protected. Eventually, the problem was resolved, although Franklin was unable to say how.

In an attempt to fill the yawning gaps in the proof, defendant further produced a two-page affidavit of Massimo Pazienza, who admitted that he was the lowest ranking member of a conspiracy that included plaintiff in the middle and Giuseppe Morandini (defendant's own lawyer in Italy) at the top, all of whom actively participated in selling out defendant and Catelli. At first blush, Pazienza appears to be a man of modesty, placing himself on the bottom rung of the conspiratorial ladder. He admits that the triumvirate undertook a

---

* No details of this transaction—not even the purchase price—are to be found in this record.

treasonable course in relaying negotiation tactics and confidential information about defendant and Catelli to Reich and the other selling stockholders of the Reich corporation. The precise nature of these disclosures is not given, but we are told that plaintiff used the information "to help make sure that the sale of Reich's stock in fact occurred, and on terms favorable to the Selling Shareholders." The affidavit is also silent on what those terms were, and what they would have been were it not for the faithlessness of the devious threesome. Thus, any damages claimed remain entirely speculative.

Pazienza identifies himself as a shareholder in an entity known as P. A. T. I., to which the Reich shareholders paid $716,000 for "various services" he rendered to them. He is too self-effacing to tell us what, if anything, he himself received out of those payments to P. A. T. I. Far more significant, however, is his reticence in failing to state whether plaintiff received a single lira, or even knew anything about the payment to P. A. T. I. Thus, there is an utter failure of proof to tie the plaintiff to the receipt of any illegal compensation or "bribe."

Whether Pazienza's support of defendant in this lawsuit has restored him, as a prodigal son, to the good graces of Catelli is not mentioned. However, one can note that both Pazienza and Catelli found their way to the same notary public (one Guido Politi) in the picturesque town of Lucca, in Italy's fabled Tuscany region, to execute their respective affidavits. This is not decisive, however, as Mr. Politi may be the only notary in town.

One further interesting fact should be noted pertinent to any purported reliance on representations made by plaintiff. As we have seen, defendant contends that plaintiff's disloyalty in March 1990 grossly inflated the price of the Reich stock, to defendant's alleged detriment, to a sum in excess of $3 million. But in February 1992, approximately two years after the original purchase and 11 months after plaintiff had resigned and disappeared from the scene, defendant purchased the remaining 15% of the common stock, at a time when it already had complete control of Reich, including full access to all of its books and records. Defendant is no more forthcoming with respect to any of the financial details of this second transaction than the first. Perhaps it is just as well. What does emerge is the elimination of any reliance by defendant on the supposed machinations of plaintiff and his coconspirators. Significant, in this regard, is that defendant was represented by reputable

counsel in the first transaction and was aided by professional accountants.

Thus, under our analysis, there is no need to make any judicial declaration with respect to the release, inasmuch as defendant has failed to demonstrate any cause of action that might challenge its vitality. We therefore modify the order appealed from to achieve the same result, albeit by an entirely different route.

Accordingly, the order, Supreme Court, New York County (Herman Cahn, J.), entered August 30, 1995, which, upon the parties' respective motions for summary judgment, declared that the subject release bars any claims by defendant against plaintiff in connection with defendant's acquisitions of a certain corporation, and dismissed defendant's counterclaims, should be modified, on the law, to vacate the declaration concerning the release, so as simply to dismiss the counterclaims without reference to the release, and as so modified, affirmed, with costs to plaintiff.

SULLIVAN, J. P., MILONAS and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered August 30, 1995, modified, on the law, to vacate the declaration concerning the release, dismiss the counterclaims without reference to the release, and, as so modified, affirmed, with costs to plaintiff.