■ JAY B. BIRNBAUM, Respondent, v SAUL I. BIRNBAUM, Appellant. ILENE L. FLAUM et al., Respondents, v SAUL I. BIRNBAUM, Appellant, and JAY B. BIRNBAUM, Respondent.— Defendant-appellant's motion for reargument granted and, upon reargument, the order of this court, entered on December 15, 1987 [135 AD2d 1154], unanimously affirming a judgment of the Supreme Court, New York County (Martin Evans, J.), entered on January 15, 1987, is vacated and withdrawn and the judgment is modified, on the law, to grant partial summary judgment to the defendant-appellant on the counter-

claim as to the payment due to his wife, and the matter remanded for a further hearing with regard to substantiation and justification of the amount paid and the amount due, and, as so modified, the judgment is affirmed, with costs and disbursements.

This is an internecine dispute between the plaintiffs, brother and sister Jay Birnbaum and Ilene Flaum, and their uncle Saul, the defendant-appellant herein. Telescoping the considerable background, the plaintiffs' father Bernard and Saul were, for many years, partners in a real estate business and, upon Bernard's death in 1976 plaintiffs succeeded to their father's interests.

Among other things, there was a failing shopping center known as Fox Hills on Staten Island, which, after a complex series of transactions, Saul managed to exchange for a very successful operation at Cherry Hill Center in New Jersey.

After the previously loving familial relationship began deteriorating in 1980 and 1981, a multiplicity of suits ensued in Monroe and New York Counties and a Referee was ultimately appointed in New York County to take an account. The Referee called the consolidated action "but one battlefield in a litigation war" and his report was adopted by the Supreme Court. We affirmed, although on further reflection it has become apparent that one aspect of the Referee's determination was in error.

Saul's wife Victoria Birnbaum was paid $345,000 from the partnership and is due, according to his counterclaim, an additional $623,000. She was initially Saul's girlfriend and later his wife. Although her services to the partnership are deprecated by plaintiffs, it is contended, with substantiation, that she handled the leasing at Cherry Hill, located the tenants, and was involved in coordinating the problems of zoning, site planning, construction supervision and the obtaining of permits, etc.

The Referee brushed aside these activities in concluding: "She was either an employee (albeit without salary but on a purported commission basis), a close friend, or wife." He decided she was acting as an "alter ego" for Saul, and that her services were those he should have rendered personally. Inasmuch as the plaintiffs rendered no services at Cherry Hill, it is somewhat specious to contend that Saul should have rendered all services. It is hornbook law that he was entitled to hire employees. Such a power is implied. (See, Crane & Bromberg, Partnership § 50, at 284 [1968].) It is also provided for in New York Partnership Law § 40 (2).

While the description of the services rendered by Victoria was considered by the Referee to have been clothed in hyperbole, there can be no dispute that she did work. Moreover, the partnership agreement provided that no partner was required to devote his entire time and attention to the business of the partnership.

The Referee's analysis is therefore based solely on the hopefully discarded notion, from an earlier era, that a woman could not be other than a shadow of her male partner.

Victoria's compensation was based on a contingent percentage arrangement. While in real estate leasing this would be normal, she did not have a real estate license. Accordingly, we remand for a determination as to the reasonable value of her services as an employee. (Cf., *Weckstein v Breitbart,* 111 AD2d 6, 8, *lv dismissed* 68 NY2d 884; *Steinberg v Goodman,* 27 NY2d 304.) Concur—Kupferman, J. P., Ellerin and Smith, JJ.

Sullivan J., dissents in a memorandum as follows: I would deny reargument, inasmuch as defendant Saul Birnbaum has failed to establish that we overlooked any significant fact or controlling principle of law. In fact, he fails even to advance any argument that was not previously considered. Nor were we in error, as the majority now contends, in deciding against Saul on the Referee's disallowance of the charges for payments he made to his wife, Victoria, without Jay's and Ilene's consent.

At the outset it should be noted that Jay and Ilene have never argued that Victoria is not entitled to be compensated from any source for work she may have performed at the Cherry Hill property. They have quarreled only with having that work charged to the property, of which they are cotenants. The Referee, former Chief Judge Breitel, succinctly framed the issue: "Although Saul's brief speaks of Victoria's claim or her entitlement to recover, she is not a party to this action. The issue is whether Saul is entitled or will be entitled to reimbursement from monies paid or claims created in favor of Victoria on obligations binding on the co-owners. Whether Victoria has a legitimate claim or cause of action against Saul based on alleged agreements, oral or written, is not within the purview of this action or reference."

In that regard, Jay and Ilene concur in the Referee's conclusion that Saul could not secretly employ Victoria to perform services he had agreed to perform without charge, and then obtain reimbursement from the property for her compensation. As the Referee concluded, she must look to Saul, person-

ally, for compensation for any services she performed at his request.

The Referee found that Saul is not entitled to reimbursement for the moneys he paid Victoria because, as with the payments to himself, he failed to obtain the agreement of Jay and Ilene. It is well established that a cotenant is not entitled to compensation for management or other services performed with respect to commonly owned property. *(Myers v Bolton,* 157 NY 393.) The same rule applies by statute if the parties were, as Saul now claims, partners. (Partnership Law § 40 [1].) Jay and Ilene did not object to the over $3,000,000 in charges for the development of the Cherry Hill property which were paid, not by Saul, but from revenues, 50% of which rightfully belonged to Jay and Ilene. These expenses, as Saul's account reflects, included such varied costs as architectural and engineers' fees, planning and zoning permits, attorneys' fees related to the project, legitimate payroll and related costs, and advertising costs.

On top of these, Saul seeks to have allowed some $612,500 in payments already made, and claims he asserts, to and for himself. When the payments were made, their purpose was never identified on the ledgers. Nor did they bear any relationship to any legitimate expenditure. From the date the accounting was filed, however, Saul has attempted to characterize them in many different ways, including "management fees", "administrative expenses", "administrative costs", "expenses", and "reimbursements".

The record is abundantly clear that Saul paid himself hundreds of thousands of dollars, which payments he has attempted, after the fact, to justify. His accounting, for example, characterized a substantial portion of the payments he made to himself through 1984 as "management fees". Beginning in 1984, he made additional substantial payments to himself (including one check for $262,500 immediately before this action was commenced), which he characterized in his account as "administration costs". It is undisputed, however, that Saul, and Jay before he was excluded by Saul, agreed to manage the property for no compensation at all. In his testimony at the hearing and in the brief to this court, he attempts to retrench and now claims that all of the payments that were made to him were to reimburse him for his out-of-pocket "expenses".

The Referee further found that the services allegedly rendered by Victoria were those which Saul agreed to perform without a fee and should have or could have been rendered by

him as a partner or tenant in common and in one or more of his various fiduciary capacities. The Referee also found that Victoria was only Saul's "executive assistant" and "alter ego", and not the developer of the property.

The Referee was clearly correct in finding that Saul could not, without the express consent of Ilene and Jay, hire Victoria on behalf of the project. *(See, e.g., Meinhard v Salmon,* 249 NY 458; *see also, Schnitzer v Josephthal,* 122 Misc 15, *affd* 208 App Div 769.)* There was neither a written agreement nor any written communication of any kind reflecting that Jay and Ilene knew of the reputed arrangement with Victoria. Both Jay and Ilene testified that they had no knowledge of any such arrangement. While Saul and Victoria testified that Jay knew that Victoria was doing the leasing, they did not similarly testify that Ilene knew of or consented to Victoria's arrangement. Faced with such conflicting testimony, the Referee stated: "[T]here is a grave insufficiency of documentary or record evidence on the critical issue of the understandings of the project co-owners. At this juncture, there is all the more reason to charge the party who resists or fails to supply the documentary proof, or even to keep and make records where business and accounting practice would require them. This is especially true of Saul, an experienced and successful businessman, trained as an accountant, and writer of meticulous memoranda."

The lack of any consent for the hiring and payment of Victoria out of property funds is merely confirmed by "Dx-T", the writing produced, under highly suspicious circumstances, during Victoria's testimony towards the end of the hearing, which writing purported to show Victoria's "deal" with the project as agreed to only by Saul. Dx-T was, at best, "unreliable", as the Referee characterized it. At worst, it was a fraud prepared only for purposes of the litigation. For instance, during the audit stage, the Justice before whom the matter was pending issued two orders requiring that all documents pertaining to the property be given to Jay and Ilene. Dx-T was never produced, despite numerous requests for the production of all documents. A Justice in a related action ordered that "all contracts and commitments" relating to Cherry Hill be delivered to Jay and Ilene. Dx-T still did not surface. In response to this order, Saul's former counsel, in a letter also signed by Saul, represented that there were "no contracts or commitments relating to the Cherry Hill property other than the leases which have already been provided to you." In a letter addressed to Saul from his accountants in 1984, they

reported a "Summary of income, expenses, distributions and commitments" in which no obligations to Victoria are mentioned; nor is there mention of Dx-T. Duerr, Saul's accountant, testified that he did not have any documentation for the moneys allegedly due Victoria, and never even mentioned Dx-T. Although Dx-T would have been crucial to Saul's claim for payment to Victoria, he never testified on direct examination about any such written agreement but, instead, described only his oral conversations with her. One of Saul's trial attorneys represented at the hearing that the first time a copy of Dx-T was in his firm's office was on the day it was introduced in evidence. When Dx-T was introduced, it was not the original, or even a copy, thereby precluding the possibility of an expert testifying as to its genuineness. No attorney or other representative of the law firm which had formerly represented Saul in this proceeding testified in support of Victoria's claim that she sent the firm the original of Dx-T. On the contrary, Saul's counsel at the hearing represented that an attorney at the former attorneys' firm "had searched his memory as well as searching records that were in possession of the [former attorneys'] firm and had not located either an original or a copy of that document." Another attorney from that firm denied the existence of such a document in a letter to Jay's and Ilene's counsel. The Supermarkets General lease for which Saul is claiming compensation to Victoria in the amount of $623,250 listed Wilbur Breslin, who received $50,000 for his role, as the only broker in the transaction. The lease does not mention Victoria or any claim on her part. Indeed, no other lease mentions any brokerage obligation or payment due to Victoria. Both Jay and Ilene denied ever having seen or heard of the document known as Dx-T, and the Referee credited their testimony.

Both the majority and Saul grossly distort the Referee's findings when they suggest that Victoria was denied compensation because she was Saul's wife. On the contrary, based upon the evidence regarding her services, which he described as "extraordinary hyperbole", the Referee expressly found that Victoria was Saul's "executive assistant" or "alter ego", but not the developer of the Cherry Hill property, as she claimed. She, therefore, was disqualified from receiving payments from the property, not because she was Saul's wife, but because Saul himself had agreed, by his own testimony, to manage the property without charging management fees and Saul could not, as a matter of law, charge for these services. The Referee merely held that if Saul had, in fact, hired

Victoria to perform the work he had agreed to do, the responsibility to pay for that work was his alone. Interestingly, the payments were not made to Victoria during the period of time she was alleged to have performed services for the project. Rather, all the payments were made to her in 1984 and 1985, after she had been Saul's wife for almost four years.

Saul clearly used the baseless payments to Victoria as a means of misappropriating the funds from the property to himself, and paying to himself, through his wife, funds he could not hope to claim in his own right. Rather than being sexist, the Referee's finding is both a factual determination of Victoria's true role as a conduit for Saul's misappropriation and a recognition of the legal principle that a fiduciary cannot secretly contrive to have his spouse perform his own duties and thereby obtain compensation to which he is not entitled. *(See, Meinhard v Salmon,* 249 NY 458, *supra; Matter of Lester,* 172 App Div 509.)

Victoria's role as Saul's "alter ego" and conduit to permit him to misappropriate the funds of the Cherry Hill project is illustrated by her inability to remember receiving $105,000 in 1984; her ignorance as to how the payments made to her were calculated; her request at trial for the opportunity to see canceled checks to determine whether she had been paid by the project; her inability to recall whether she was paid $200,000 from another project, as Saul's accountant testified; and the absence of W-2's, 1099's, tax returns or other documentation to reflect the payments allegedly made to her. After many days of testimony and the introduction of hundreds of documents, it is still not clear what, if anything, Victoria did for the project. Saul's own prior testimony that Victoria had worked 15 hours a day throughout this period on another project certainly suggests that she could not have done what she claims on the Cherry Hill project.

Under these circumstances, the Referee, as the trier of fact, was more than justified in requiring documentation of Saul's claims regarding Victoria. Yet, not a single letter, memorandum or writing of any kind alleged to have been written by Victoria was introduced at trial. The record is bereft of any letter or other document from attorneys, planners, contractors, subcontractors, zoning experts, the Planning Board, architect or tenant addressed to or even mentioning Victoria. That a person could work as a "project coordinator" for six years and not leave a scrap of paper memorializing that performance strains credulity.

The only document that mentions Victoria, and upon which

Saul rests his entire claim that Jay and Ilene knew of her involvement, is a note sent to her by Jay in April of 1980 informing her of the source of a demographic report he had sent to Saul. That document, mischaracterized by Saul as demographic data, is the type of note that one would direct to an "administrative assistant". Furthermore, Saul's own witnesses indicated that Victoria's role was nothing more than that of an administrative assistant. For example, Mr. Rosen, an architect hired by Saul and paid by the project, testified that Victoria "acted as a go-between" with other contractors for discussions on partial payments, "sent us shop drawings", "reviewed" his comments, and "accompanied" him to the jobsite on one occasion. He also remembered that Victoria called the electric company to make sure that the tenants had meters. Mr. Wallach, the Supermarkets General representative, recalled a telephone call to Victoria, complaining about a tenant dumping hair. He also noted that Victoria "attended" the Planning Board hearings with both Saul and him. Victoria herself recalled performing such routine tasks as calling Roto Rooter to resolve sewer line stoppages, calling tenants to tell them to cover their garbage dumpsters, arranging access for utility service personnel, and, on one occasion, calling the police to report a theft. Certainly, these were not the type of tasks for which Saul, an experienced real estate developer and investor, might have required specialized assistance.

The other major portion of Saul's claim on behalf of Victoria is that she obtained major leases for the project, a claim again not substantiated by the evidence. Saul claimed in his accounting, for example, that the project owed Victoria $623,250 as a brokerage commission on the Supermarkets General lease. There was, of course, no evidence that such a claim had ever been made prior to the accounting. More importantly, though, as this record shows, Victoria never obtained Supermarkets General as a tenant. Thus, even a payment on a quantum meruit basis would be inappropriate.

Saul could not offer a single memorandum or other writing to show that Victoria conducted any lease negotiations, that she attended any meetings, or that she procured any of the tenants, including Supermarkets General. On the contrary, Supermarkets General was known to Saul as the prospective anchor tenant prior to the date of the commencement of Victoria's alleged involvement, May 1, 1980, because Montgomery Ward, the then tenant of the space, was already negotiating with Pathmark (Supermarkets General) in March 1980. Furthermore, in another document, dated May 20, 1980,

Saul, without mentioning Victoria, stated: "I had two long conversations prior to my setting up an appointment to lease the entire premises at Cherry Hill to Supermarkets General." And, as already noted, the only broker listed in the Supermarkets General lease was Wilbur Breslin. When questioned, Victoria herself was totally unfamiliar with the financial condition of the property or the complex transactions with Montgomery Ward and Supermarkets General. She even thought that Bill Bigham, her own attorney, was from Montgomery Ward.

Even Saul's witnesses would not confirm that Victoria was the person who secured Supermarkets General as a tenant. Mr. Wallach of Supermarkets General, the only witness capable of corroborating Victoria's testimony, could not recall whether the initial contact came from Saul or Victoria. In addition, Wilbur Breslin testified that Victoria was not present during the negotiations that followed the initial aborted attempt to make a deal with Supermarkets General. Clearly, Saul failed to sustain his burden of proving that Victoria worked at all on the Supermarkets General lease.

The April 1985 payment of $240,000 to Victoria, later characterized as a commission with respect to another tenant, Seaman's, was equally illegitimate. Mr. Seaman's own testimony hardly suggested that Victoria was the procuring cause of that lease or that she had to go to such extraordinary lengths to entice Seaman's as would justify this huge payment. As he stated, "I ran some advertisements in the Philadelphia Inquirer and some local real estate newspapers looking for locations and Victoria Tree called me and told me of the availability of this location, which coincidentally was adjacent to a Levitt's store. Five of our units are located near Levitt's stores and we find it advantageous to be close by, so it was natural for us."

Finally, although the Referee did not have to reach the issue, Victoria was not a licensed real estate broker or salesperson, and her entire alleged compensation arrangement as set forth in Dx-T was therefore illegal under New York law. (See, Real Property Law § 440 [1], [2]; § 442-d; *Karlinsky v Silberman,* 259 App Div 1016, *affd* 285 NY 666; *Matter of Doherty v Cuomo,* 64 AD2d 847, *appeal dismissed* 45 NY2d 960.)