ILENE L. FLAUM et al., Individually and as Coexecutrices and Cotrustees of BERNARD P. BIRNBAUM, Deceased, et al., Appellants-Respondents, v SAUL I. BIRNBAUM, Individually and as Coexecutor and Cotrustee of BERNARD P. BIRNBAUM, Deceased, Respondent-Appellant. (And a Third-Party Proceeding.)

Fourth Department, November 10, 1986

184

APPEARANCES OF COUNSEL

*Harris, Beach, Wilcox, Rubin & Levey (James M. Hartman* of counsel), for appellants-respondents.

*Suozzi, English & Klein, P. C. (David Trager* and *Richard H. Dolan* of counsel), for respondent-appellant.

*MacKenzie, Smith, Lewis, Michell & Hughes* for third-party respondents.

### OPINION OF THE COURT

DENMAN, J.

Petitioners, beneficiaries of the estate of Bernard P. Birnbaum, seek an order removing and surcharging respondent Saul I. Birnbaum as coexecutor of the estate; imposing a constructive trust on 50% interest in two properties known as Queensbury Plaza and the bank parcel; ordering the reconveyance to the estate of 50% interest in Queensbury Plaza; directing an accounting by Saul of the profits from his operation of Queensbury Plaza; directing an accounting by Saul of profits from his sale of the bank parcel; and directing Saul to pay attorneys' fees. Petitioners appeal from so much of the order and decree of the Surrogate as directed the estate to pay Saul the amount due on a corporate note and mortgage which the Referee found Bernard personally guaranteed during his

lifetime; failed to direct Saul to account for a debt owed by the corporation to the estate; failed to order the permanent removal of Saul as coexecutor; and failed to direct Saul to pay petitioners' attorneys' fees. Respondent cross-appeals from so much of the order and decree as imposed constructive trusts upon his interests in Queensbury Plaza and the bank parcel and directed a reconveyance and/or an accounting with respect to respondent's operation and sale of those properties.

■ We conclude that the Surrogate erred in ordering the estate to pay Saul on the note and mortgage; that he erred in failing to order Saul to account for a corporate debt to the estate; that he properly imposed constructive trusts on 50% interests in Queensbury Plaza and the bank parcel and properly ordered a reconveyance and/or an accounting with respect to those properties; and that he properly denied petitioners' requests for the permanent removal of Saul as coexecutor and the imposition of liability upon him for petitioners' attorneys' fees.

### FACTUAL BACKGROUND

This proceeding focuses on allegations of conversion, fraud and self-dealing by Saul Birnbaum in a series of transactions which resulted in divestment of the estate's interest in Queensbury Plaza and an adjacent parcel (the bank parcel) in Glens Falls, New York, and culminated in Saul's acquisition of fee title to both properties and his entire control of the corporation which operated those properties. A previous proceeding focused on similar allegations against Saul in his acquisition of other estate assets (see, Matter of Birnbaum v Birnbaum, 117 AD2d 409). A brief description of the parties to these proceedings and the general background of this bitterly contested estate litigation can be found in our prior opinion in Birnbaum (supra). As in the previous proceeding, the issues on this appeal require us to examine the circumstances surrounding various transactions occurring during Bernard's lifetime and following his suicide in 1976.

### FORMATION OF THE CORPORATION

Queensbury Plaza, Inc. (the corporation), was formed in 1961 by Bernard Birnbaum, David Hannah and Myron Hunt. The corporation's principal asset was a long-term leasehold interest in a 12-acre parcel owned by John Miller, and later, by his estate. The corporation also owned a fee interest in a

one-quarter acre parcel located adjacent to the 12-acre parcel. The corporation constructed a shopping center, known as Queensbury Plaza, on the 12-acre parcel and sublet space to various commercial tenants. The corporation also constructed a building on the adjacent parcel which the First National Bank of Glens Falls occupied under a long-term lease.

### THE 1963 AGREEMENT—THE ESTATE'S DEBT TO SAUL

Following construction of the shopping center, the corporation ran into financial difficulty. In March 1963, Saul loaned the corporation $139,158.72 and took back a promissory note from the corporation. This note was 50% guaranteed by Bernard who was a 50% shareholder. In May 1963, Saul loaned the corporation an additional $100,000. In exchange for this loan, Saul took back a new note obligating the corporation to pay Saul a total of $240,347.49. Saul also took back a second mortgage on the corporation's leasehold interest in the plaza property and, in addition, received 50% of the corporation's stock. There is no documentary evidence that the second corporate note to Saul was personally guaranteed by Bernard. Nevertheless, it is Saul's claim that there is evidence of Bernard's personal guarantee in an unsigned letter from Bernard to a third shareholder, David Hannah, to the effect that Bernard and Hannah were "personally liable" on the corporation's $240,000 debt to Saul. There is no question that the corporation defaulted on the note shortly after it was made and that the only payments ever made were interest payments of $36,000 in 1974 and 1975 and $15,000 in 1976. However, the record indicates that those payments were made by the corporation, not Bernard, and as Saul himself asserts, were clearly designed "to give the corporation an interest deduction in each year of payment." Saul immediately returned those payments to the corporation. On the basis of an unauthorized calculation of compound interest at 7½%, Saul computed the amount due on the note and mortgage, including interest, to be $535,000 as of February 1977, treated that amount as principal, and seeks to collect that amount plus interest from the estate.

### SAUL'S DEBT TO THE ESTATE

The general contractor for construction of the plaza was B.C.H. Construction Corp. (BCH). BCH was 90% owned by Bernard Birnbaum. Pursuant to an agreement dated August

14, 1961, the corporation was to pay BCH or its shareholders (Bernard and David Hannah) 10% of the net construction costs. In 1964 BCH assigned this account receivable to Prime Real Estate Company (Prime), an entity wholly owned by Bernard. This debt was never paid to BCH or to Prime and the corporation continuously carried the debt of approximately $200,000 on its books as a corporate liability. In 1977, after Bernard's death, Sidney Finger, accountant for the estate, determined that he could not find any substantiation for the debt running from the corporation to BCH or Prime. After discussing the matter with Saul, Finger simply eliminated this liability from the books of the corporation, which was then owned 50% by Saul and 50% by the estate, but which later changed form to an entity owned almost entirely by Saul. Finger simultaneously eliminated from the books of Prime, a corporation owned wholly by the estate, the account receivable represented by this debt.

### SAUL'S PURCHASE OF THE PLAZA AND BANK PARCELS

By the time of Bernard's death in 1976, the corporation was encountering critical financial difficulties as a result of deterioration of the plaza, obsolescence, vacancies and unprofitable subleases. Fearing the loss of his investment, Saul proposed to the beneficiaries a complex series of transactions purportedly designed to revitalize the property and turn around its fortunes. The first step involved Saul's proposed purchase of the bank parcel from the corporation (owned one half by the estate and one half by Saul) and of the plaza property from the estate of John Miller. In February 1977, Saul purchased the bank parcel from the corporation. The nominal consideration of $25,000 for the property was reflected in a credit in Saul's favor against the alleged $530,000 debt owed by the estate to Saul on the 1963 note and mortgage. Saul subsequently sold the bank parcel to the bank for $56,000 cash plus the bank's assumption of a $224,000 mortgage on the premises.

Later in 1977, after Janice (Bernard's widow and coexecutor of his estate) refused to sanction the estate's participation in the purchase, Saul individually purchased a fee interest in the plaza property from the estate of John Miller for $440,000, including $200,000 cash. This $200,000 was withdrawn from the estate by Saul in partial payment of the alleged debt of Bernard. Thus, as in the case of Saul's purchase of the bank

parcel, Saul purchased the plaza property with funds obtained from the estate upon his representation that such funds were part of a debt owed to him by the estate.

### DISSOLUTION OF THE CORPORATION AND FORMATION OF THE LIMITED PARTNERSHIP

The second step proposed by Saul and agreed to by Janice and Jay, her son, was dissolution of the corporation and formation of a limited partnership, Queensbury Plaza Associates (Associates). In reflection of their respective shares of the corporation, Associates was owned 50% by Saul and 49% by the estate as limited partners, and 1% by a newly formed entity, Q.B.P. Real Estate Corp., as general partner. The dissolution of the corporation and formation of the limited partnership was purportedly designed to permit the estate and Saul to obtain income tax benefits which they could not take advantage of as corporate shareholders. Additionally, Saul represented that the change in the form of ownership would enable the estate and Saul to take advantage of nondisturbance provisions in the subleases to cancel those unprofitable subleases.

### THE SURROGATE'S DECREE

Finally, Saul, Janice and Jay agreed upon a third step in the plan to revitalize the plaza and distribute the estate's interest in it to the beneficiaries. This involved the termination of Associates' leasehold interest in the plaza. In March 1978, the beneficiaries executed waivers of citation and Saul prepared a petition by which he sought to obtain the Surrogate's permission to default the estate's interest in the leasehold. The effect of that would be to cause the unprofitable subleases to fail. Thus, Saul's fee interest would be unencumbered and Saul would be free to negotiate more favorable leases with prospective tenants. Jay, Janice and Ilene, Janice's daughter, consented to having the estate's interest declared in default in exchange for Saul's promise that Jay and Ilene would participate with Saul in a joint venture to operate the plaza. The petition was submitted to then Surrogate Telesca together with the waivers of citation. The Surrogate granted Saul permission to "take such action as he deems appropriate to terminate the leasehold interest of Queensbury Plaza Associates * * * in the same manner as though Saul Birnbaum had no fiduciary relationship in the Estate of Bernard P.

Birnbaum." In March 1978, in accordance with the Telesca decree, Saul, as landlord, served a notice upon Associates declaring it to be in default under the lease agreement, although a formal termination of leasehold interest was not served upon Associates until four years later.

## JOINT VENTURE AGREEMENT AND ITS AFTERMATH

In April 1978, Saul, Jay and Ilene entered into a joint venture agreement whereby the joint venture acquired the leasehold interest in the shopping center. The joint venture agreement contemplated that Saul would be the landlord and that the joint venture would be the tenant. The agreement required Jay and Ilene to contribute $110,000 in capital while Saul was to contribute $110,000 in capital and a $100,000 loan. Following these contributions, Saul would own a 50% share in the joint venture, Jay would own a 33⅓% share, and Ilene a 16⅔% share. Jay and Ilene never made the capital contributions required; however, they joined Saul in personally guaranteeing a $600,000 mortgage loan taken out by the joint venture in order to rehabilitate the plaza. Nevertheless, as a result of the failure of Jay and Ilene to make the capital contributions, and probably in response to Janice's commencement of litigation against him, in August 1982 Saul formally notified Associates that its interest in the plaza was terminated pursuant to the notice of default served four years earlier. Saul thus declared himself sole owner of both the fee and leasehold interests in the plaza. In the interim, favorable subleases had been negotiated with new commercial tenants and the plaza had become profitable.

## FINDINGS OF THE REFEREE

Referring to the 1964 letter from Bernard to David Hannah, the Referee found that Bernard acknowledged his personal liability on the $240,000 corporate note and mortgage and that this debt was thus a valid obligation of the estate. In response to petitioners' argument that any claim for payment on this debt was time barred as a result of Saul's admission that the corporation was in default on the note from the outset, the Referee determined that the interest payments made in 1974-1976, which the Referee found to have been made by Bernard, constituted an acknowledgment reviving the obligation. The Referee thus concluded that the amount of the note, with interest at 6%, was available to Saul as a credit against his liability to the estate.

With respect to the corporate debt to Prime, the Referee concluded, on the basis of Sidney Finger's testimony, that this debt could not be substantiated and that Finger properly eliminated the debt as an account payable on the books of the corporation and as an account receivable on the books of the estate. The Referee therefore declined to recommend that Saul be ordered to account for this debt which he unilaterally eliminated from the corporation's books.

On the issue of Saul's self-dealing, the Referee found that Saul breached his fiduciary duty by individually acquiring estate assets, without court approval, in exchange for a credit against the estate's alleged indebtedness to him. The Referee found that while Saul "benefited the estate" by reducing its indebtedness to him and by ridding the property of unfavorable subleases, he nonetheless benefited himself and thereby violated the rule requiring a fiduciary to exercise undivided loyalty on behalf of the estate. Consequently, the Referee recommended that constructive trusts be imposed upon 50% interests in the plaza and the bank parcels; that Saul be directed to reconvey such interest in the plaza and account for the profits of his operation of the plaza; and that Saul be directed to account for the profits from his sale of the bank parcel.

The Surrogate adopted the Referee's findings and recommendations in their entirety.

THE ESTATE IS NOT LIABLE TO SAUL
ON THE CORPORATE DEBT

■ It has been Saul's contention throughout these proceedings that Bernard was liable to him during his lifetime on a "running account" between the brothers (see, Matter of Birnbaum v Birnbaum, 117 AD2d 409, 413, supra). In the context of this proceeding, Saul contends that Bernard was personally liable to him on a corporate debt of $240,000. In support of this claim, Saul relies upon documentary evidence that Bernard personally guaranteed the March 1963 corporate note for $140,000, as well as circumstantial evidence that Bernard personally guaranteed the second corporate note executed in May 1963. The Surrogate credited Saul's claim and ordered the estate to repay this debt together with accrued interest at 6%. That was error.

The March 1963 note contained Bernard's personal guarantee to pay 50% of a $140,000 corporate debt to Saul. However,

the May 1963 note for $240,000, which contained no such guarantee, constituted a novation discharging Bernard's liability on the March 1963 note. The subsequent note presents a consolidation of the corporation's liability for Saul's initial advance of $140,000 and his subsequent loan of $100,000. There is no claim by Saul that he advanced more than the sum represented by the second note. At the time of this second advance, Saul received additional consideration of a second mortgage on the corporation's principal asset, the leasehold interest in the plaza, plus 50% of the corporate stock. The elements of novation are thus present. There was a valid previous obligation; the parties agreed to a new contract; a valid new contract was formed; and the parties indicated their intention to extinguish the old contract (see, 22 NY Jur 2d, Contracts, § 401). "It is well settled that 'where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement' " (Northville Indus. Corp. v Fort Neck Oil Terms. Corp., 100 AD2d 865, 867, affd 64 NY2d 930). Thus, Bernard's personal guarantee on the initial note was extinguished by the new note.

Saul argues, and the Surrogate found, that Bernard personally guaranteed the second note during his lifetime and it thus was a valid obligation of the estate. There is no support for that conclusion in the record. Saul was unable to produce documentary evidence that Bernard personally guaranteed the note and relies only on a letter from Bernard to Hannah, then a shareholder, stating that they were personally liable to Saul on the note. The letter is unsigned by Bernard, the party to be charged, and thus cannot satisfy the writing requirement for imposing this liability upon the estate (see, General Obligations Law § 5-701 [2]).

Saul also relies on the 1974 through 1976 interest payments on the debt as an acknowledgment and revival of the obligation (see, General Obligations Law § 17-101). However, it is apparent from the record that Bernard did not make those payments and therefore they cannot suffice to impose liability upon the estate. Sidney Finger testified that payments were made by corporate checks, Saul's own records state that the loan account ran between the corporation and Saul, and Saul's contention on appeal is that the payments were designed to give the corporation an interest deduction in the

year of payment. Quite apart from the issue of whether the debt is time barred, there is no proof that this was a personal obligation of Bernard so as to be chargeable against the estate. We therefore modify the Surrogate's decree to delete the paragraph ordering the estate to pay Saul this debt. However, we note that, if it is not time barred, the debt is a valid obligation of the corporation which Saul may use as an offset against amounts owed to petitioners as a result of Saul's self-dealing in acquiring estate assets and assuming control of successors to the corporation.

### SAUL MUST ACCOUNT FOR THE CORPORATE DEBT TO THE ESTATE

■ We conclude that the Surrogate erred in finding that a corporate debt to Prime was properly stricken from the books of the corporation and from the estate's balance sheet on the basis of Saul's contention that it could not be substantiated by the estate's accountants. Sidney Finger testified that in 1977 when he prepared an opening balance sheet for Associates, as successor to the dissolved corporation, he attempted to substantiate an account payable of approximately $200,000 which had been continuously carried on the books since 1961. This debt was owed to Prime and later to Bernard's estate. When Finger could not substantiate the origin of the debt, he discussed the matter with Saul and the two decided simply to eliminate it from the books. At the same time, they eliminated it from the estate's statement of assets and liabilities on the rationale that if it were not a proper account payable on the corporation's books it was not properly reflected as an account receivable on Prime's books. Saul did not seek court approval for eliminating that estate asset (see, SCPA 1805).

The effect of this flagrant self-dealing was to wipe out a $200,000 liability of Associates, which evolved into an entity solely owned by Saul, while simultaneously wiping out an asset of Prime, an entity wholly owned by the estate. Regardless of whether this debt could be substantiated by the accountant, simply eliminating a 16-year-old entry representing a presumptive claim of the estate falls far short of the vigorous advocacy of the estate's interests which Saul, as coexecutor, was bound to exercise. Moreover, this debt could have been substantiated by reference to corporate documents to which Saul had access but which he apparently failed to disclose to Finger. This $200,000 liability is directly traceable to the

corporation's unpaid debt to BCH, an entity controlled by Bernard, pursuant to a 1961 agreement obligating the corporation to pay BCH 10% of the net costs of constructing the plaza. This receivable was transferred by BCH to Prime in 1964, a transaction which also is reflected on the corporation's books. Thereafter, the debt was continuously reflected on corporate statements received by Saul. Finally, in a December 15, 1975 memo to Saul, Bernard recited that the corporation still owed him $212,000. Saul's failure to disclose this documentary proof of the debt to the estate, together with his complicity in eliminating the debt entry from the books of the corporation, constitute a clear breach of fiduciary duty. We modify the Surrogate's decree to order Saul to account for this debt to the estate.

### THE SURROGATE PROPERLY IMPOSED CONSTRUCTIVE TRUSTS AND ORDERED RECONVEYANCE AND AN ACCOUNTING OF ESTATE INTERESTS

As we have previously stated in these proceedings, "[o]ne of the most stringent precepts in the law is that a fiduciary shall not engage in self-dealing and when he is so charged, his actions will be scrutinized most carefully. When a fiduciary engages in self-dealing, there is inevitably a conflict of interest: as fiduciary he is bound to secure the greatest advantage for the beneficiaries; yet to do so might work to his personal disadvantage. Because of the conflict inherent in such transaction, it is voidable by the beneficiaries unless they have consented. Even then, it is voidable if the fiduciary fails to disclose material facts which he knew or should have known, if he used the influence of his position to induce the consent or if the transaction was not in all respects fair and reasonable (II Scott, Trusts § 170, at 1298 [3d ed 1967]) * * * '[A]ny acquisition of the shares of the beneficiaries by one of the fiduciaries must be dealt with as presumptively void unless affirmative proof is made by the fiduciaries that their dealings with each beneficiary was in every instance aboveboard and fully informative. The fiduciaries in such circumstances have the obligation to show affirmatively not only that they acted in good faith but that they volunteered to the beneficiaries every bit of information which personal inquiry by the beneficiaries would have disclosed' *(In re Rees' Estate,* 72 NYS2d 598, 599, *mod on other grounds* 277 App Div 839.)" *(Matter of Birnbaum v Birnbaum, supra,* pp 416-417.)

■ It is graphically evident that Saul engaged in self-deal-

ing in his acquisition of the bank parcel and the fee and leasehold interests in the plaza parcel. With respect to the bank parcel, Saul purchased it from a corporation in which the estate held a 50% interest. He did so, not with his own funds, but in consideration of a $25,000 reduction in a debt which he misrepresented that the estate owed him. We have previously held that this alleged debt from Bernard to Saul has never been proven and that Saul's purchase of estate property in exchange for credits against this alleged indebtedness constituted a breach of Saul's fiduciary duty to the beneficiaries of the estate (see, Matter of Birnbaum v Birnbaum, 117 AD2d 409, 414, 417-418, supra). Saul purchased the bank parcel for a nominal consideration of $25,000 and within two years sold it to the lessee for $56,000 plus the lessee's assumption of a $224,000 mortgage. The disparity between the purchase and sale prices makes clear Saul's self-dealing and usurpation of an estate opportunity. A finding of self-dealing is even more strongly compelled by the fact that the property was purchased with estate funds obtained by Saul's misrepresenting that such funds were owed to him.

With respect to the plaza parcel, Saul purchased it from the estate of John Miller for $200,000 plus a $240,000 mortgage secured by his newly acquired bank parcel. The $200,000 cash payment was also obtained from the estate in partial satisfaction of the debt which Saul misrepresented that the estate owed to him. Following Saul's purchase of the plaza, he obtained the beneficiaries' consent to the default of Associates' (and thus the estate's) leasehold interest. It is clear that the beneficiaries consented to this on the understanding that a joint venture would be formed by which the beneficiaries would retain their interest in the plaza and realize their inheritance. Instead, the joint venture never got off the ground, ostensibly because the beneficiaries failed to make the required capital contributions, although Saul has never satisfactorily explained why the beneficiaries were required to capitalize the venture in order to participate in an enterprise in which they had a 50% interest. Within four years Saul had formally terminated the estate's interest, leaving the beneficiaries with nothing and Saul with a fee interest encumbered only by favorable subleases which he was able to negotiate as a result of his termination of the estate's leasehold interest. Thus, the culmination of Saul's actions was his acquisition of both the leasehold and fee interests in the plaza, the latter purchased with estate funds, and the total divestment of the estate's interest.

We have previously held that imposition of a constructive trust, forced reconveyance, and an accounting are appropriate remedies in these circumstances *(see, Matter of Birnbaum v Birnbaum,* 117 AD2d 409, 416-420, *supra).*

We reject respondent's argument that Bernard's will authorizes his self-dealing and that the Surrogate thus erred in holding him to a strict fiduciary duty of undivided loyalty instead of a lesser standard of good faith. The general language in Bernard's will authorizing his executors and trustees to exercise broad discretionary powers in estate matters cannot serve to erode Saul's fiduciary obligations and do not authorize him to divest beneficiaries of the protections to which they are entitled by law *(see, Renz v Beeman,* 589 F2d 735, 744-745; *Matter of Durston,* 297 NY 64, 71-73). Moreover, Saul's actions warrant the imposition of a constructive trust even judged by the less strict standard of good faith. Saul's purchase of an estate property with estate funds and prompt resale of it for many times its purchase price can hardly be considered an act in good faith. Similarly, Saul's purchase of the plaza property with estate funds and his subsequent termination of the beneficiaries' leasehold interest fall far short of even that lesser standard of fiduciary obligation.

Saul contends that Surrogate Telesca's decree permitting him to take action without regard to his fiduciary duty to the estate is res judicata as to petitioners' claims of self-dealing. We disagree. Apart from the testimony of the beneficiaries that they signed waivers of consent at Saul's instruction without realizing their significance and without first seeing Saul's petition, it is clear that the petition did not set forth the complete facts surrounding these complex transactions. There is no doubt that the Surrogate would have withheld his consent to Saul's proposal if he had realized that the result of the transactions would be the complete divestment of the estate's interest in the plaza and Saul's acquisition, with estate funds, of a fee interest.

Saul contends that the proof before the Referee demonstrated that the beneficiaries knowingly consented to the transactions now challenged by them. We have previously held that Saul, as coexecutor, family patriarch, and dominant force in the family businesses, breached his duty of full disclosure, thus invalidating any purported consent, when, without court approval, he purchased estate assets in partial satisfaction of the estate's alleged indebtedness to him *(see, Matter of Birnbaum v Birnbaum, supra,* pp 417-419). The same

result is compelled in this case by the proof that Saul purchased estate assets in return for credits against the estate's alleged indebtedness to him. Since that debt was not a valid obligation of the estate, Saul deviated from his obligation of full disclosure to the beneficiaries when he represented the authenticity of that debt. Moreover, it is apparent that the beneficiaries did not give a knowing consent inasmuch as they were never informed that the culmination of these transactions would be the complete divestment of their interest in the properties.

■ Finally, we reject Saul's argument that petitioners' request for imposition of a constructive trust on the bank parcel is time barred. An action for a constructive trust must be brought within six years of accrual (CPLR 213 [1]; *Lyons v Quandt,* 91 AD2d 709, 710). If measured from the February 1977 date of the deed conveying the bank parcel to Saul, this action, commenced in August 1983, would be untimely. Nevertheless, we view Saul's acquisition of the bank parcel as part of a common, continuous scheme of self-dealing which culminated in Saul's termination of the estate's leasehold interest in the adjacent plaza. So viewed, the cause of action accrued no later than August 1982 when Saul formally terminated the leasehold interest in the plaza, refused to perform his promise to permit the beneficiaries to participate in the venture, and thereby withheld from the beneficiaries their interest in the properties *(Matter of Sroczyk,* 96 AD2d 749; *Walsh v Walsh,* 91 AD2d 1198; *Lyons v Quandt, supra).* Only when Saul formally terminated the estate's leasehold interest were the beneficiaries put on notice of the ultimate effect of his scheme to divest them of their interest in the properties *(see, Two Clinton Sq. Corp. v Friedler,* 91 AD2d 1193, 1194).

PETITIONERS' OTHER REQUESTS

In this proceeding, petitioners renew their application for various items of ancillary relief, including an order permanently removing Saul as executor, denying him all executor's fees and commissions, and surcharging him for petitioners' attorneys' fees. The Surrogate denied all of these requests without prejudice. As in *Birnbaum,* we hold that "it was within the Surrogate's discretion to postpone action on those matters until a final determination of the several issues still to be litigated" (117 AD2d 409, 420, *supra).*

Accordingly, the decree should be modified in accordance with this opinion, and, as modified, affirmed.

CALLAHAN, J. P., DOERR, BOOMER and SCHNEPP, JJ., concur.

Order and decree unanimously modified, on the law and the facts, and, as modified, affirmed, without costs.