In the Matter of ILENE L. FLAUM et al., Individually and as Temporary Coadministrator, C. T. A. and Trustee of the Estate of BERNARD P. BIRNBAUM, Deceased, et al., Appellants-Respondents, v VICTORIA BIRNBAUM, as Executrix of SAUL I. BIRNBAUM, Deceased, Individually and as Coexecutor and Cotrustee of BERNARD P. BIRNBAUM, Deceased, Respondent-Appellant and Third-Party Petitioner. JAY B. BIRNBAUM et al., Third-Party Respondents-Appellants-Respondents.

Fourth Department, March 13, 1992

## APPEARANCES OF COUNSEL

*Harris, Beach & Wilcox (James Hartman* of counsel), for appellants-respondents.

*MacKenzie, Smith, Lewis, Michell & Hughes (James Hart-man* of counsel), for Jay B. Birnbaum, third-party respondent-appellant-respondent.

*Allen & O'Brien (John J. Keigher* of counsel), for respondent-appellant.

## OPINION OF THE COURT

DENMAN, P. J.

Petitioners are Janice Birnbaum, Ilene Flaum, and Central Trust Company, who are, respectively, a suspended coexecutrix and the temporary coadministrators of the estate of Bernard P. Birnbaum (hereinafter the estate). The original respondent was Saul Birnbaum (Saul), a suspended coexecutor of the estate, but since Saul's death on April 20, 1991, Victoria Birnbaum, Saul's widow and the executrix of his estate, has been substituted as the respondent. This proceeding focuses on allegations of conversion, fraud and self-dealing by Saul in a series of transactions that resulted in divestment of the estate's interest in Queensbury Plaza, Inc. (the corporation or the plaza) and in two adjacent parcels of land (the bank parcel and the small parcel) in Glens Falls, New York. Those transactions culminated in Saul's acquisition of fee title to the properties and his complete control of the entity which operated them. We have had the Queensbury matter on two prior occasions *(see, Flaum v Birnbaum,* 120 AD2d 183; *Flaum v Birnbaum,* 168 AD2d 933).[1] In our November 1986 decision and order in Queensbury I *(Flaum v Birnbaum,* 120 AD2d 183, *supra),* we exposed Saul's self-dealing, awarded the estate a one-half undivided interest in the plaza, imposed a constructive trust in the estate's favor on Saul's interests in the plaza and the bank parcel, and ordered Saul to reconvey and account for his operation and/or sale of those properties.

Presently before us are cross appeals from an order and decree of Surrogate's Court. The Surrogate's order and decree was issued in response to cross motions by the estate and Saul to confirm in part and modify in part the report of a Referee,

---

1. Parallel proceedings in this and other courts have involved Saul's misappropriation of other estate assets, viz., its interests in shopping centers and other properties in Great Neck, New York *(see, Matter of Birnbaum v Birnbaum,* 117 AD2d 409, *on appeal after remand* 157 AD2d 177), Cherry Hill, New Jersey *(Birnbaum v Birnbaum,* 139 AD2d 462 [1st Dept], *mod* 73 NY2d 461), and Belleville and Springfield, New Jersey *(Matter of Birnbaum v Birnbaum,* 171 AD2d 1074).

who determined the issues raised by the estate's objections to Saul's accounting. The Surrogate modified the Referee's report in five respects but otherwise adopted it and incorporated it into his decision.

On appeal, the estate challenges the Surrogate's order and decree insofar as it (1) permitted Saul to recover 50% of his alleged loans to Queensbury between 1977 and 1986; (2) held that the estate was not similarly entitled to 50% of its advances to Queensbury; (3) held that Queensbury's 1963 debt to Saul was not time barred and could be asserted by Saul as an offset; (4) awarded Saul a credit for interest payments made in 1974, 1975 and 1976 on the 1963 corporate debt to Saul; (5) held that the estate was 50% responsible for repayment of Saul's 1985 debt to Bank Leumi; (6) held the estate 50% responsible for approximately $108,000 in legal fees incurred by Saul; (7) held that the estate had no interest in the 1.2-acre "small parcel"; (8) held that Saul was entitled to an offset against a 1961 corporate debt to the estate; and (9) refused to impose sanctions against Saul for his failure to account fully in accordance with the orders of this court and the Surrogate.

On his cross appeal, Saul challenges the Surrogate's order and decree insofar as it directed him to pay the entire balance of the corporation's 1961 debt to the estate.

### THE SURROGATE DID NOT ERR IN DECLINING TO ASSESS SANCTIONS AGAINST SAUL.

■ Saul's misappropriation of estate assets commenced shortly after Bernard's death. Consequently, the Surrogate, in a March 31, 1987 order implementing our 1986 decision, correctly interpreted it as requiring Saul to "give a full and complete accounting of the Queensbury Plaza project from February 13, 1976, to the present". Nonetheless, over two years went by until Saul, in response to a conditional order of contempt issued by the Surrogate in February 1989, submitted his purported accounting. Upon examination, Saul's purported accounting proves to be woefully deficient in complying with the directives of this court and the Surrogate. Saul's accounting covers only the period October 1, 1982 to January 1, 1988, ignoring (except for his own claims against the estate) the periods from February 1976 through September 1982 and 1988 to the present. Even more serious, as admitted in the testimony of Saul's own accountant, Saul's submission is "not

* * * an accounting at all", but rather a largely unsubstantiated "summary of cash receipts and cash disbursements". Critically, the "accounting" does not provide opening balances setting forth the plaza's market value and enumerating its assets at the time of Bernard's death or even on the October 1, 1982 date from which Saul chose to account. It is clear that Saul used his purported accounting as a vehicle for asserting new claims, or reasserting discredited old claims, against the estate. For that reason, we agree with the Referee's assessment that "based upon the account as filed * * * it is impossible to establish the precise amount which Saul must reimburse the estate as a result of the breach of his fiduciary obligations". We disagree with the Surrogate's contrary observation that Saul has "satisfactorily" accounted.

The estate requested both the Referee and the Surrogate to impose "sanctions" against Saul for his failure to render a complete accounting in proper form. The Referee deferred the issue of sanctions to the Surrogate. The Surrogate denied the estate's request "in the exercise of [his] discretion". On appeal, the estate reiterates its request that "sanctions [be] imposed against Saul for his patent and contumacious failure to submit a complete and adequate accounting".

■ The estate does not cite any authority for imposing punitive sanctions. There is no basis for such sanctions either in the Surrogate's Court Procedure Act or in the Uniform Rules for Trial Courts (see, 22 NYCRR part 207).[2] Similarly, we conclude that the provisions of CPLR 8303-a do not apply. This case is not an action to "recover damages for personal injury, injury to property or wrongful death". Thus, by referring to "sanctions", the estate necessarily must be referring to punitive damages, a category of relief requested in the various petitions in this action.

■ The question thus is whether the Surrogate abused his discretion in declining to award punitive damages on account

---

2. We note that the estate's request is not supported by SCPA 1807 (2), which allows a fiduciary to be surcharged for his fraud or negligence in allowing and paying a claim (including the fiduciary's own claim) against the estate. Although the general object of these proceedings is to surcharge Saul for his self-dealing while he was coexecutor, the estate on this appeal seeks punitive sanctions for Saul's wrongful conduct within the context of the litigation itself. SCPA 1807 (2) contemplates the assessment of compensatory damages, not punitive sanctions, against a self-dealing fiduciary, and appears to be directed at wrongful conduct carried out by the respondent while he was fiduciary, not, as is the case here, following respondent's suspension as fiduciary.

of Saul's failure promptly and completely to account to the estate. There can be no doubt that Saul, compounding his misappropriation of estate assets, engaged in dilatory and obstructive tactics throughout this litigation. In particular, the improper form of Saul's purported accounting was obviously designed to conceal rather than reveal the full extent of his defalcations. Nonetheless, we conclude that the Surrogate did not err in refusing to award punitive damages. As we observed on appeal of the North Shore Mart matter, "[i]mposition of punitive damages is discretionary, not mandatory" *(Matter of Birnbaum v Birnbaum,* 157 AD2d 177, 192, *supra).* Additionally, the fact that Saul died during the pendency of this appeal must be taken into account. There is a strong policy against the assessment of punitive damages against an estate on account of the wrongful conduct of the decedent *(see,* EPTL 11-3.2 [a] [1]; *Gordon v Nathan,* 43 AD2d 917). Consequently, we decline to disturb that portion of the Surrogate's order and decree denying the estate's request for sanctions.

### THE SURROGATE ERRED IN ORDERING SAUL TO PAY THE ESTATE THE ENTIRE AMOUNT OF THE 1961 DEBT AND IN GRANTING SAUL AN OFFSET AGAINST THE CORPORATE DEBT.

Queensbury Plaza, Inc. was formed in 1961 by Bernard Birnbaum and two other men. Eventually, the corporation was owned by Bernard and Saul in equal shares. The corporation's principal asset was a long-term leasehold interest in a 12-acre parcel upon which it constructed a shopping center, known as Queensbury Plaza, in which the corporation sublet space to various commercial tenants. The corporation also owned an adjacent one-quarter-acre parcel (the bank parcel) upon which it constructed a building that it leased to the First National Bank of Glens Falls. In connection with its construction of the plaza and bank, the corporation incurred a debt of $196,732.07[3] to the general contractor, BCH Construction Corp., 90% of which was owned by Bernard. In 1964 the corporation's debt to BCH was assigned to Prime Real Estate Company, an entity wholly owned by Bernard. Between 1961 and 1976, when Bernard died, the corporation made no payments on the debt to BCH or Prime, but carried the debt on

---

3. Calculated as of February 28, 1976.

its books as a corporate liability, while Prime carried it on its books as an asset. In 1977, Saul, then coexecutor, breached his fiduciary duty to the estate by directing that those entries be eliminated from the books of the corporation and of Prime. The effect was to wipe out an approximately $200,000 liability of the corporation, which, as a result of Saul's self-dealing, later became solely owned by Saul, while simultaneously wiping out an asset of Prime, an entity wholly owned by the estate.

Our 1986 decision directed Saul to account to the estate for the $196,732.07 corporate debt to Prime, which Saul did in Schedule I of his accounting. Saul also set forth a claimed offset of $84,671.44 plus interest from May 15, 1968. Saul offered no substantiation for the existence, basis and amount of the alleged $84,671.44 offset, but merely asserted that it stemmed from Bernard's pre-May 15, 1968 withdrawals from the corporation in the name of BCH, which Bernard allegedly wrote off in 1973. Saul testified that there had been no payment or acknowledgment of the debt by BCH or the estate. Thus, Saul essentially admitted that the debt was time barred, a contention raised by the estate as a ground for denying the offset. The estate also objected to the claimed offset on the ground that the alleged debt was not a proper subject of the accounting action. During the trial, the Referee apparently agreed with the estate's position, ruling that the claimed offset was not properly before him. Nonetheless, in his report, the Referee held that Saul was entitled to an offset for the alleged debt of BCH to the corporation. The Surrogate adopted that finding, thereby granting Saul an offset of approximately $164,000 ($84,671.44 plus interest) against the corporate debt to the estate, which the Surrogate determined to be $391,224.80 plus interest; Saul was directed to reimburse the estate in that net amount.

■ The estate is correct in contending that the claimed offset was not a proper component of the accounting, and that in any event the debt has long been time barred. The estate also correctly contends that Saul failed to substantiate the debt. The Surrogate thus improperly allowed the debt as an offset, and the order and decree must be modified accordingly.

■ Additionally, Saul correctly contends that he should have been directed to pay the estate only one half of the corporate debt, not the whole debt. At the time Saul removed the entries from the books of the corporation and Prime, Saul

and the estate were equal shareholders in the corporation. Thus, the debt essentially was one half the obligation of the estate and one half the obligation of Saul. The estate was aggrieved by Saul's striking the credit from the books of Prime, an estate entity, only insofar as the debt was Saul's obligation. Therefore, Saul should be directed to reimburse the estate for one half of the debt. The Surrogate's order and decree must be modified to direct Saul to pay the estate $195,612.40 plus interest.

### THE SURROGATE ERRED IN GRANTING SAUL AN OFFSET FOR THE PLAZA'S 1963 DEBT TO HIM.

In 1963 Saul loaned the corporation $240,000 and, in addition to receiving 50% of the corporate stock, took back a note and mortgage from the corporation. Until 1974, the corporation made no payments of principal or interest on that obligation. The corporation did make interest payments totaling $87,330 between 1974 and 1976, but the record makes clear that those "payments" were accounting transactions only, to give the corporation a tax deduction for those years. Saul immediately remitted those payments to the corporation, so that the transactions were, in Saul's own words, a "wash". Following Bernard's death, Saul misrepresented to the beneficiaries that the 1963 debt was a personal obligation of Bernard, and also misrepresented the amount of the obligation. Those misrepresentations were instrumental in Saul's scheme to divest the estate of its interests in the shopping center and bank parcel. In our 1986 decision, we rejected Saul's claim that the 1963 debt was a valid obligation of the estate *(see, Flaum v Birnbaum,* 120 AD2d 183, *supra).* At the same time, we noted that the debt might be a valid obligation of the corporation, one half of which had been owned by Bernard and one half by Saul. We thus held that, if the debt were not time barred, Saul could assert one half of the debt as an offset against the estate's claims against him *(see, Flaum v Birnbaum,* 120 AD2d 183, 193, *supra).*

In Schedule D of his accounting, Saul sought an offset based on the 1963 debt, the balance of which Saul calculated to be $1,436,649.03 in March 1989, with interest compounded at 9% per year. Rejecting the estate's contention that Saul's claim on the debt was time barred, the Referee recalculated the balance at $563,400 and awarded Saul a credit for one half of that sum, or $281,700. The Surrogate modified that determina-

tion in two respects not relevant to the present discussion, thereby granting Saul an offset in the amount of $352,816.44.

■ We conclude that Saul's attempt to enforce the 1963 debt is time barred and that he was improperly granted an offset for one half of that obligation. Although it cannot be said with certainty when Saul first interposed the claim, it was no earlier than September 1983, when Saul served his response to the original petition herein. The corporation defaulted on the first installment, which was due August 8, 1963. Under the terms of the note, if all installments had been paid on time, the last installment would have been due no later than 1974. Thus, under the six-year Statute of Limitations of CPLR 213 (4), the claim was time barred in 1980 unless revived by some action attributable to the estate.

■ Saul contends, and the Referee found, that the debt was revived for limitations purposes by the corporation's payment of interest in 1974, 1975 and 1976. The applicable rule is not broad enough to encompass those payments. Part payment of a debt is not sufficient to revive a time-barred obligation unless the payment is made in circumstances from which a promise to pay the remainder may be inferred (*Jacobs v Patterson*, 143 AD2d 397, 398; *Galyn v Schwartz*, 77 AD2d 437, 440, *mod on other grounds* 56 NY2d 969, citing *Crow v Gleason*, 141 NY 489, 493). Here, the circumstances surrounding the 1974-1976 interest payments do not support the inference that the corporation intended to pay the remainder of its obligation. The record establishes that the corporate payments to Saul were merely accounting entries, not actual payments. Because those payments did not imply a promise to pay the remainder of the debt, they did not revive it for limitations purposes.

Saul also argued, and the Referee agreed, that the corporate debt to Saul was revived by the beneficiaries' express assumption of it in the 1977 assumption agreement and the 1978 joint venture agreement. In the circumstances of this case, that argument must fail. As we made clear on the prior appeal in this matter, the 1977 and 1978 agreements were the means by which Saul fraudulently divested the estate of its interest in the plaza (*see, Flaum v Birnbaum*, 120 AD2d 183, 189-190, 195-196, *supra*). The necessary effect of that finding was to nullify those agreements, and thus they may not be relied upon to revive the debt. The Surrogate's order and decree must be modified insofar as it grants Saul an offset based on the 1963 debt and, additionally, insofar as it grants Saul an

offset for his remittance to the corporation of the 1974-1976 interest payments.

## THE ESTATE MUST BE AWARDED A ONE-HALF INTEREST IN THE "SMALL PARCEL".

Saul purchased the bank parcel from the corporation in 1977 in exchange for a $25,000 reduction in a "running debt" that Saul misrepresented that the estate owed him. Approximately two years later Saul sold the bank parcel to the bank for $56,000 cash plus the bank's assumption of a $224,000 mortgage that Saul had given to the prior owner of the plaza property. Saul thus purchased the bank parcel in his own name with funds belonging to the estate and eventually sold it on his own account for many times what he had paid for it. As a result of Saul's obvious fraud and self-dealing in those transactions, we imposed a constructive trust on the proceeds of Saul's sale of the bank parcel, and directed him to account for those proceeds *(Flaum v Birnbaum,* 120 AD2d 183, 194-196, *supra).* At the accounting proceeding, it came to light that a second conveyance had occurred on the same day that Saul sold the bank parcel to the bank. That second transaction involved the bank's conveyance of the 1.2-acre "small parcel" to Saul. That "small parcel" lies directly adjacent to the plaza property and is used for employee parking. Saul contended that the two conveyances were separate and that he paid $20,000 in cash for the "small parcel". He offered no documentation to support that claim. The estate sought a one-half interest in the "small parcel", but the Referee denied that claim. The Referee found that Saul purchased the small parcel with his own funds, and that "[t]his parcel does not appear to be part of the land over which the Surrogate and the Appellate Division imposed a constructive trust". The Surrogate adopted that finding.

It was clearly error to deny the estate a one-half interest in the "small parcel". There is no substantiation for Saul's assertion that the transactions were separate and that Saul paid for the "small parcel" with his own funds. Moreover, the circumstances, including the fact that the conveyances were executed on the same day and involved the parties' trading of adjacent parcels of land, strongly rebut any contention that the sales were not related. Viewing the transactions as interrelated, we find that Saul sold the bank parcel to the bank in exchange for cash, the bank's assumption of the mortgage,

and the "small parcel". In imposing a constructive trust upon Saul's acquisition and sale of the bank parcel, we contemplated that there would be a tracing of the proceeds that Saul received upon his sale of the bank parcel, and additionally, that the estate would succeed to a one-half interest in those proceeds. It is clear that the proceeds of Saul's sale of the bank parcel included the small parcel. Thus, the Surrogate's order and decree must be modified to impose a constructive trust upon the small parcel and to direct Saul to reconvey a one-half interest in it to the estate.

THE SURROGATE IMPROPERLY GRANTED SAUL AN
OFFSET FOR HIS "LOANS" TO THE PLAZA, BUT PROPERLY
DISALLOWED THE ESTATE'S ATTEMPT TO RECOVER 50%
OF ITS ALLEGED "ADVANCES" TO THE PLAZA. SIMILARLY
THE SURROGATE ERRED IN GRANTING SAUL AN OFFSET
FOR ONE HALF OF HIS 1985 DEBT TO BANK LEUMI
AND FOR ONE HALF OF CERTAIN LEGAL FEES INCURRED
BY HIM.

In Schedule C of his "accounting", Saul sought a credit for 50% of the loans that he claimed he made to the plaza between 1977 and 1986, a total of $162,317.75 plus interest. On the other hand, based on the testimony of Jay Birnbaum, the estate sought reimbursement for certain cash advances that it claimed were made to cover plaza expenses between 1976 and 1981, a total of $126,165.69 plus interest. No loan agreements, bills, notes, etc. were adduced in support of either claim. The Referee sustained Saul's claim in part, granting him a credit in the amount of $52,508.87 plus interest, representing 50% of Saul's claimed loans to the plaza from 1977 to 1978 and from 1982 to 1986. The Referee reached that conclusion under "equitable principles", reasoning that Saul could not produce documentary evidence in support of his claim because, at all relevant times, he considered himself to be the sole owner of the plaza and could not have been expected to bill or sue himself to recover the alleged loans. The Referee did not address the estate's claim for reimbursement of 50% of its alleged loans. The Surrogate adopted the Referee's analysis of the point. The estate now contends that it was error for the Surrogate to grant Saul a credit for 50% of his

alleged loans to the plaza, and that the error was compounded by the Surrogate's failure to reimburse the estate for its advances to the plaza.

■ As the accounting fiduciary, Saul had the burden of proving the fairness, reasonableness, and uprightness of all his dealings vis-à-vis the estate and the estate property *(Flaum v Birnbaum,* 120 AD2d 183, 194, *supra).* Saul also had the burden of proving that he engaged in the transactions only after obtaining the consent of the beneficiaries after full disclosure *(Birnbaum v Birnbaum,* 73 NY2d 461, 466-467, *supra; Matter of Birnbaum v Birnbaum,* 157 AD2d 177, 189, *supra; Flaum v Birnbaum,* 120 AD2d 183, 194, *supra; Matter of Birnbaum v Birnbaum,* 117 AD2d 409, 419, *supra; see, Birnbaum v Birnbaum,* 139 AD2d 462, 466 [Sullivan, J., dissenting], *mod* 73 NY2d 461, *supra).* Saul failed to provide any documentation to support his claim that he made the alleged loans, nor did he prove that the loans, if made, were necessarily and prudently incurred for a proper purpose. Moreover, Saul failed to show that the estate beneficiaries assented to the transactions after full disclosure. In the absence of such proof, payment of one half of Saul's alleged loans to the plaza is not a valid or enforceable obligation of the estate.

With respect to the estate's countervailing claim for reimbursement, the record is similarly lacking in documentation substantiating that such advances were in fact made. We thus conclude that the Referee and the Surrogate did not err in disallowing the estate's attempt to recover one half of those alleged advances.

In Schedule F of his accounting, Saul claimed reimbursement for 50% of the $1,316,842.12 indebtedness that he incurred in taking out a personal loan from Bank Leumi. Saul claimed that he used the money to pay construction costs incurred in rehabilitating the plaza between 1982 and 1986. "Based upon equitable principles", the Referee and the Surrogate agreed with Saul's contention that the estate should contribute to payment of that debt.

■ We disagree. Viewing the background of this case, we cannot conclude that the estate's one-half interest in the plaza should be encumbered with one half of Saul's obligation to Bank Leumi. During the relevant time frame, Saul operated the plaza as though he was the sole owner after defrauding the estate of its interest in the property in breach of his

fiduciary duty. Thereafter, Saul continued knowingly to breach his fiduciary obligation to the estate by receiving the plaza's income in his own name, expending plaza funds for his own benefit, and unilaterally incurring various charges against the property. The Bank Leumi debt is one such charge. In order for it to be a valid obligation of the estate, the charge must have been fairly and reasonably incurred by Saul with the informed consent of the estate (*Birnbaum v Birnbaum,* 73 NY2d 461, 466-467, *supra; Flaum v Birnbaum,* 120 AD2d 183, 194, *supra).* Because of Saul's failure to account fully, it is impossible to rule out the likelihood that Saul was required to borrow the funds for the cost of construction because he had looted other funds of the plaza. Therefore, we cannot conclude that the construction indebtedness was fairly and reasonably incurred (*see, Birnbaum v Birnbaum,* 139 AD2d 462, 466-470 [Sullivan, J., dissenting], *mod* 73 NY2d 461, *supra; Flaum v Birnbaum,* 120 AD2d 183, 194, *supra).* In any event, Saul failed to elicit the informed consent of the beneficiaries before incurring the debt (*Birnbaum v Birnbaum,* 73 NY2d 461, 466-467, *supra).* A wrongdoer who makes improvements to another's property with knowledge of the true owner's rights is barred from recovering the costs of those improvements (*Shelley v Cody,* 187 NY 166, 170; *Wood v Wood,* 83 NY 575, 581; *Warner v Warner,* 199 App Div 159, 165-166; *see, Vulovich v Baich,* 286 App Div 403, 405, *affd* 1 NY2d 735). Thus, Saul may not impose upon the estate the costs of his unauthorized borrowing to cover the alleged costs of improving property that he misappropriated from the estate.

Finally, insofar as pertinent to this appeal, in Schedule H of his accounting, Saul sought to have the estate reimburse the corporation for $37,336.27 in legal fees that Saul claimed he paid in 1986 and 1987. As the Referee found, Saul offered "no proof * * * as to the nature of the legal services performed and so it is impossible to determine if such services were of any benefit to Queensbury". Thus, the Referee determined that Saul should pay the estate one half of that legal expense, $18,668.13, plus interest. The Surrogate modified the Referee's determination, finding that the estate's consent to those fees was "unnecessary" and further finding that those charges were equally allocable to the estate and to Saul.

██ The Surrogate's order and decree is in error insofar as it denied the estate reimbursement for one half the legal fees paid out of plaza funds in 1986 and 1987. In the absence of proof by Saul that the fees were incurred fairly and reason-

ably and with the estate's informed consent *(Birnbaum v Birnbaum,* 73 NY2d 461, 466-467, *supra; Flaum v Birnbaum,* 120 AD2d 183, 194, *supra)*, there is no basis for allowing Saul to charge one half of those fees against the estate.

Saul also sought to have the estate contribute ratably to certain legal fees billed by, but not yet paid to, two law firms. At trial, Saul contended that the fees were fairly and reasonably incurred in connection with various plaza litigation and his attempt to sell the plaza. With the exception of a charge totaling $18,298.55, to which Central Trust, the current coadministrator, explicitly consented, Saul failed to show that he elicited the informed consent of the estate for those expenditures. The Referee concluded that, "although in some instances Saul may have acted both unilaterally and imprudently, on balance he acted in the best interests of Queensbury and not for personal gain". Accordingly, the Referee determined that the estate and Saul were equally responsible for payment of $71,978.75 in unpaid legal fees. The Surrogate adopted the Referee's recommendation.

In our view, it was error to order the estate to contribute ratably to legal fees incurred by Saul without the consent, and in some cases over the objection, of the estate *(Birnbaum v Birnbaum,* 73 NY2d 461, 466-467, *supra; Matter of Birnbaum v Birnbaum,* 157 AD2d 177, 189, *supra; Flaum v Birnbaum,* 120 AD2d 183, 194, *supra)*. Therefore, we modify the Surrogate's order and decree to direct the estate to reimburse Saul $9,149.28, plus interest, representing one half of the $18,298.55 legal expense to which the estate consented. The effect of such modification is to deny Saul reimbursement for other unpaid legal fees, a total of $53,680.20, incurred by him.

Accordingly, the Surrogate's order and decree should be modified in the following respects:

Subparagraph (o) of the second decretal paragraph should be modified to direct Saul to pay the estate $195,612.40 plus 9% interest from April 1, 1989;

Subparagraph (r) should be added to the second decretal paragraph and should direct Saul to pay the estate $18,668.13 plus 9% interest, on the sum of $2,205.68 from December 31, 1986 and on the sum of $16,462.45 from December 31, 1987, representing one half of certain legal fees paid from Queensbury Plaza funds;

The third decretal paragraph should be deleted;

The fourth decretal paragraph should be deleted;

The fifth decretal paragraph should be deleted;

The tenth decretal paragraph should be deleted;

The eleventh decretal paragraph should be modified to direct that Saul and the estate be equally responsible for payment of unpaid legal fees in the sum of $18,298.55;

The twenty-fifth decretal paragraph should be modified to grant the petitioners' claim that Saul must convey to the estate a 50% interest in the parking lot parcel adjacent to the plaza parcel.

GREEN, PINE and DOERR, JJ., concur.

Order and decree unanimously modified, on the law and facts, and, as modified, affirmed, with costs to petitioners in accordance with the opinion by DENMAN, P. J.