

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-29-1994

# T&N, PLC v. PA Insur. Guar. Assn.

Precedential or Non-Precedential:

Docket 93-2011

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"T&N, PLC v. PA Insur. Guar. Assn." (1994). *1994 Decisions.* Paper 203.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/203

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

_____

Nos. 93-2011 and 93-2012
_____

T&N, plc,

Appellant/Cross-Appellee

vs.

PENNSYLVANIA INSURANCE GUARANTY ASSOCIATION

Appellee/Cross-Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 90-cv-04946)
_____

Argued
June 6, 1994
Before:  MANSMANN, ALITO and ROSENN, Circuit Judges.
(Filed November 29, 1994)
_____

Mark F. Rosenberg, Esquire
Philip L. Graham, Jr., Esquire (ARGUED)
Tariq Mundiya, Esquire
Sullivan & Cromwell
125 Broad Street
New York, New York 10004

Richard L. Berkman, Esquire
William R. Spade, Jr., Esquire
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, Pennsylvania 19103

   COUNSEL FOR APPELLANT/CROSS-APPELLEE

Lise Luborsky, Esquire
Joseph M. Hankins, Esquire (ARGUED)
Britt, Hankins, Schaible &
   Moughan
Two Penn Center Plaza
Suite 515

Philadelphia, PA  19102

  COUNSEL FOR APPELLEE/CROSS-APPELLANT

---------

OPINION OF THE COURT

---------

MANSMANN,  Circuit Judge.

The Pennsylvania Insurance Guaranty Association ("PIGA") is an association of independent property and casualty insurers within Pennsylvania, created by The Pennsylvania Insurance Guaranty Act, 40 Pa. Cons. Stat. Ann. § 1701 et seq. (1970) for the purpose of providing a means of relatively prompt payment of covered claims in the stead of an insolvent insurer. Membership in PIGA is required before an insurer is authorized to write insurance policies within Pennsylvania.  A "covered claim" under the Act must be the claim of a Pennsylvania "resident" or must pertain to property permanently located in Pennsylvania.

In this interlocutory appeal arising out of multiple claims seeking multi-millions of dollars in asbestos personal injury damages, T&N, plc, an English corporation with its principal place of business in England, seeks to recover from PIGA over $5 million under the terms of a settlement agreement with the American Mutual Liability Insurance Company.  American Mutual is the insolvent insurer of T&N's now dissolved Pennsylvania asbestos manufacturing subsidiary, the Keasbey and Mattison Company.  Since Keasbey's dissolution, T&N has been the target of thousands of claims brought by individuals alleging bodily injury and/or property damage caused by Keasbey's

asbestos-containing products.  Following an action which T&N commenced against American Mutual in the federal district court, T&N and American Mutual negotiated a settlement agreement which bound American Mutual to pay T&N a certain sum under the Keasbey policies.  When American Mutual defaulted and was adjudged insolvent, T&N commenced this action against PIGA.

We must decide whether T&N's claim based on the terms of the settlement agreement is deemed to have arisen under American Mutual's property and casualty insurance policy so as to fall within the scope of covered claims under the Act, or whether the agreement served to extinguish the Keasbey policies.  We must also decide whether T&N's claim satisfies the residency requirement of the Act, either by virtue of Keasbey's Pennsylvania residency while it was still viable, T&N's alleged alter ego relationship with Keasbey, and/or by T&N's direct Pennsylvania contacts.  We must further decide the merits of T&N's assertion that recovery from PIGA is authorized to the extent that the underlying personal injury claimants are Pennsylvania residents.  Finally, we must decide whether T&N has a potential claim against PIGA for claims arising from the loss or liability to any property permanently situated in Pennsylvania.

We conclude that the settlement agreement did indeed arise under the insurance policies, and hence may support a covered claim.  We also conclude that T&N may have a viable covered claim with respect to affected property, but that it does not otherwise meet the residency requirements of the Act.  We

hold, however, that because the settlement agreement encompassed all of T&N's claims against the insurance company, T&N has only one potential covered claim which is subject to the $300,000 limit under the Act.

I.

Keasbey and Mattison Company was a Pennsylvania corporation with its principal place of business in Pennsylvania and which manufactured asbestos-containing products from the early 1930's until 1967. Keasbey was the named insured on standard liability polices issued by American Mutual Liability Insurance Company from at least April 1, 1946 through October 1, 1965. The policies provided primary coverage for asbestos and other latent disease product liability claims. In 1962, Keasbey sold its assets and filed for dissolution under Pennsylvania law. The dissolution became final in 1967.

T&N, plc, is a corporation organized under the laws of England and having its principal place of business in England. From 1934 until 1938, T&N owned the majority of Keasbey's stock. From 1938 until Keasbey's dissolution, T&N owned one hundred percent of Keasbey's stock either directly or indirectly.

Beginning in 1978, T&N was sued by thousands of individuals who alleged that since T&N was the sole shareholder of Keasbey, it was liable to them for the bodily injury they had suffered due to their exposure to asbestos. As a result, in 1982 T&N filed a declaratory judgment action against American Mutual in the United States District Court for the District of Columbia,

seeking coverage for over 1,000 asbestos claims.  With respect to seven selected asbestos cases, the district court entered partial summary judgment in favor of T&N.  It found that due to its status as a shareholder of Keasbey, T&N was an additional insured under the policies which were issued to Keasbey.  The district court then directed the parties to attempt to reach an agreement regarding the amount of damages T&N was entitled to receive.

Subsequently, T&N and American Mutual entered into a settlement agreement which provided in pertinent part:

2.  This Agreement is intended to confer rights and benefits only upon T&N and American Mutual, and is not intended to confer any right or benefit upon any other person.  No person other than T&N or American Mutual shall have any legally enforceable right under this Agreement.  All rights of action for any breach of this Agreement are hereby reserved to T&N and American Mutual.

5.  This Agreement is the entire agreement between T&N and American Mutual.  All antecedent or contemporaneous extrinsic representations and warranties made in the negotiation and preparation of this Agreement are intended to be merged in the Agreement and of no further effect.

6.  For the purposes of resolving their dispute American Mutual and T&N agree that the limits of liability for all Keasbey policies shall be a total of _____[1].

7.  American Mutual shall pay to T&N the aforesaid limits of all Keasbey policies . . . as well as a portion of T&N's defense costs. . . .

8.  Upon execution of this Agreement, American Mutual shall be considered to have no further duties or obligations based upon, arising out of

---

[1].     The district court deleted the amount from the opinion, stating that because the settlement was filed under seal, there was no valid reason to disclose the amount.

or related to any policy of insurance issued to Keasbey by American Mutual and all such policies shall be considered exhausted, null and void and of no further force or effect. (District Court Opinion dated May 28, 1992, pp.3-4)

T&N alleges that American Mutual defaulted on this agreement because it failed to pay installments which were due on January 3, 1989 and January 4, 1990. In an unrelated matter, on March 9, 1989, the Massachusetts Supreme Judicial Court found that American Mutual was insolvent, appointed a permanent receiver, and ordered that the company be liquidated.

On July 30, 1990, T&N filed a complaint in the United States District Court for the Eastern District of Pennsylvania, seeking damages from PIGA under the Pennsylvania Insurance Guaranty Act because the Association failed to assume American Mutual's payment obligations under the settlement agreement[2] and under the terms of the actual insurance policies which were issued to Keasbey.[3]

It is undisputed that the Pennsylvania Insurance Guaranty Act and the Association were established in response to the social harms which result from insurance insolvencies. Sands v. Pennsylvania Insurance Guaranty Association, 283 Pa. Super. 217, 423 A.2d 1224 (1980). Every property and casualty insurance carrier in Pennsylvania is a member of PIGA. Indeed, membership

_____

[2].     T&N is seeking to obtain the balance which remains due under the settlement agreement.

[3].     T&N also requested punitive damages for the bad faith denial of its claims.

in PIGA is a condition of an insurer's ability to write insurance policies in Pennsylvania.  One of the purposes of the Act is to:

> (1) Provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims, and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer . . . .
> 40 Pa. Cons. Stat Ann. § 1701.102.

By order entered May 29, 1992, the district court found that the settlement agreement is a matter which "arises under" the insurance policies issued by American Mutual as that phrase is utilized in section 1701.103(5)(a) of the Act.  The court denied summary judgment with respect to the other aspects of Count I without prejudice to renewal after the completion of discovery.  Summary judgment was granted in favor of PIGA with respect to T&N's claims which were based on the insurance policies because the settlement agreement nullified the policies.  PIGA's motion for summary judgment on the bad faith claim was also denied without prejudice to renewal after the completion of discovery.

After discovery was completed, each party filed a motion for summary judgment.  By opinion and order entered May 27, 1993, the district court held in pertinent part that while T&N was not a resident of Pennsylvania and that Keasbey's residence was irrelevant, T&N could rely on the residency of its underlying claimants and the right of those claimants to bring a claim against T&N to meet the residency requirement of the Act.  However, PIGA would only be liable if the underlying claimants

were Pennsylvania residents at the time of the insured event[4] or if the claims were for losses to property which was permanently located in Pennsylvania and the claims would have been covered by a Keasbey policy. If the underlying claimant changed residence during the time between exposure and manifestation and a policy was in effect, PIGA's liability was to be prorated based on the portion of the time the claimant lived in Pennsylvania during that period. To ensure that recovery would be so limited, the district court established an analytic framework to determine the extent of PIGA's liability.

By order entered September 10, 1993, the district court certified the 1992 and 1993 orders for interlocutory appeal, specifically certifying seven questions for our review.[5] By

---

[4]. The district court defined the insured event as the period from exposure to asbestos to the claimant's manifestation of an asbestos-related disease.

[5]. The questions which were certified are:

1) Did the District Court err in holding that the settlement agreement arose out of insurance policies?

2) Did the District Court err in holding that Keasbey's residence was not relevant under Section § 1701.103(5)(a)(i)?

3) Did the District Court err in holding that T&N was not a resident of Pennsylvania?

4) Did the District Court err in holding that T&N could rely on the claims represented in the settlement agreement and the residence of the underlying claimants to meet the residency requirement of the Act?

5) Did the District Court err in holding that T&N

order dated October 13, 1993, we granted the petitions for leave to appeal pursuant to 28 U.S.C. § 1292(b). For purposes of our review we have grouped the seven certified questions into three main issues: (1) whether T&N has a covered claim; (2) if T&N does have a covered claim, whether it has only one claim or a claim for each of the underlying asbestos claimants; and (3) if T&N does have a covered claim, whether the analytical framework established by the district court was appropriate. Because we determine that T&N does not have a covered claim under the statute except for property damage and that only one claim is implicated, we need not reach question 3.[6]

(..continued)
could rely on the claims represented in the settlement agreement and the location of property which sustained loss to meet the residency requirement of the Act?

6) Did the District Court err in holding that the $299,000 limit for recovery applied to each of the underlying claims?

7) Did the District Court err in holding that PIGA's liability for defense costs in the settlement agreement was the smaller of the actual individual amount or prorated amount of the costs?
(District Court's Order entered September 10, 1993)

[6]. Federal courts sitting in diversity "must apply the substantive law of the state whose laws govern the action." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990) (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938). The parties agreed that Pennsylvania substantive law applies to this action.

II.

A covered claim is defined in relevant part in 40 Pa. Cons. Stat. Ann. § 1701.103 as:

> 5(a)  **"Covered Claim"** means an unpaid claim, including a claim for unearned premiums, which arises under a property and casualty insurance policy of an insolvent insurer and is:
>
> (i)  The claim of a person who at the time of the insured event resulting in loss or liability was a resident of the Commonwealth, or
>
> (ii)  A claim arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth . . . .
>
> *    *    *

Thus, an essential element of a covered claim is that it arise out of an insurance policy. PIGA argues that T&N's claim arises out of the settlement agreement, not out of the insurance policies, because the insurance policies were nullified upon the execution of the settlement agreement. Therefore, T&N's claim should not be covered by the Act.

It does not appear that any Pennsylvania court has addressed whether a settlement agreement which is entered into in connection with an insurance policy could support a covered claim under the Act. Courts in other states, however, have found that disputes arising from settlement agreements do constitute covered claims under their insurance guaranty acts. See Buggae v. Yellow Checker Cab Co., 623 So.2d 906 (La. App. 1993); Lastie v. Warden, 611 So.2d 721 (La. App. 1992), cert. denied, 614 So.2d 64 (La. 1993); Betancourt v. Arizona Property & Casualty Insurance Fund, 170 Ariz. 296, 823 P.2d 1304 (1991); Thornock v. Pack River

Management Co., 790 F.Supp. 1014 (D. Mont. 1990) aff'd in part and rev'd in part, 942 F.2d 794 (9th Cir. 1991); and London v. Florida Insurance Guaranty Association, 486 So.2d 56 (Fla. App. 1986). PIGA argues that these cases are not dispositive because the courts were not faced with the settlement of a coverage dispute, the settlement agreement did not nullify the underlying insurance policies, the settlement agreement did not act as a novation, and the cases did not involve a non-resident insured who was seeking recovery based on underlying claimants who had no rights under the settlement agreement. We do not find these arguments to be persuasive.

The settlement agreement between T&N and American Mutual would never have come into being if not for the insurance policies. The amount of money which was to be paid under the settlement agreement represented the total of the policy limits on all of the insurance policies.[7] As a result, we find that the settlement agreement arose under the insurance policies and may support a covered claim provided that all of the other requirements of the Act are met. To hold otherwise would discourage parties from entering into settlement agreements.[8] Thus, the district court did not err in holding that the settlement agreement arose under an insurance policy.

---

[7]. A portion of T&N's defense costs was also represented in the agreement.

[8]. We also note that under section 1701.201(b)(1)(iv) of the Act, PIGA may review settlements to determine the extent to which those settlements should be contested.

III.

Our next question then is whether T&N is, or can be considered to be, a Pennsylvania resident. Such a determination is necessary because only Pennsylvania residents may assert a covered claim under the Act. See § 1701.103(5)(a)(i). Unfortunately, "resident" is not defined in the Act and it appears that no Pennsylvania court has yet interpreted the term. T&N suggests three methods by which it meets the residency requirement of the Act: (A) it can use the residence of its underlying claimants, (B) it can use Keasbey's residence, and (C) it can be considered a resident of Pennsylvania.

A.

The district court held that while T&N was not a Pennsylvania resident and Keasbey's residence was irrelevant, T&N could use the residence of the underlying claimants to meet the residency requirement of the Act. As a result, to the extent that T&N could show that an underlying claimant was a Pennsylvania resident at the time of the insured event, it would have a covered claim. T&N's recovery would also have to be prorated if an underlying claimant changed his or her residence during the relevant period.

The district court grounded its decision to permit T&N to use the residence of its underlying claimants on the fact that the definition of "person" under the Act includes a claimant. As a result, underlying claimants (tort victims) can have covered

claims under the Act. The district court then looked at section 1701.503(b) of the Act which states that, except in the case of a first party claim for damage to property which has a permanent location, if a person has a claim which is covered by more than one guaranty association, he or she must seek recovery first from the association located where the insured resides. The district court then reasoned that because of the interaction between the definition of "person" and section 1701.503(b), a non-resident claimant could rely on both an insured tortfeasor's residence and the right to make a claim in order to come within the Act. Otherwise, a non-resident claimant who was seeking recovery from the association where the insurer resides would not be able to meet the residency requirement of the Act.

While the situation presented here is the opposite of that described above, the district court stated that the analysis was similar. Under section 1701.503(b), a non-resident insured did not have to rely on the residence and claims of the underlying claimants because the insured's residence determined where recovery was to be sought in the first instance. However, the fact that section 1701.503(b) indicated that a person, who was defined as a policyholder or claimant, may have a claim which was covered under more than one guaranty association suggested that in certain situations, a non-resident insured could rely on the residence of the underlying claimants and the right to make a claim to meet the residency requirement. This interpretation ensured that the underlying claimants would be able to recover damages from the insured.

While the district court noted that these claimants also have a right to proceed against the guaranty association, it stated that in cases where the insured is unable to recover from its own guaranty association[9], it would be unfair not to interpret section 1701.103(5) to allow the insured to rely on the residence of the underlying claimants. It also noted that such a result would discourage settlements, would lead to multiple suits which would delay payments to Pennsylvania claimants, and could encourage non-resident insureds to engage in delaying tactics to force the tort victims to bring actions against PIGA instead of continuing their suits against the insured.

We disagree with the district court's analysis. The purpose of the Act is clearly to protect <u>Pennsylvania</u> residents. If the underlying Pennsylvania claimants can proceed against PIGA to recover for their losses, their rights are protected; they will not suffer any harm from the insured's inability to pay them. Therefore, giving the insured the ability to rely on the underlying claimants' residence does not provide the underlying Pennsylvania claimants with money they would not have received if the insured was not permitted to recover under the Act. The district court's analysis does not provide the underlying Pennsylvania claimants with any additional protection. Rather, it merely allows a non-resident to make a claim against the Act. Such a result violates the intent of the Act which is to protect

---

[9]. England apparently does not have an insurance guaranty association.

Pennsylvania residents.  While it is unfortunate that T&N apparently does not have a guaranty association which it can approach for relief, this does not affect Pennsylvania and PIGA should not be forced to pay T&N's claim based on this reason alone.

We note as well that PIGA is authorized to pay "claims".  Therefore, the claims that are relevant are those that PIGA is being asked to pay.  Since T&N is the one with the claim, its residence is the one which should be examined.  As a result, T&N must be the one who was a resident of Pennsylvania at the time of the insured event which resulted in loss or liability.  At the time of the insured event, T&N was a resident of England.  Thus, we conclude that T&N cannot claim recovery from the Association by adverting to the Pennsylvania residency of its underlying claimants.

### B.

With respect to whether T&N has a covered claim in its own right, T&N first argues that the district court erred in finding that Keasbey's residence was irrelevant.  In T&N's view, Keasbey's residence should be determinative because it was a Pennsylvania resident, the actions leading up to the asbestos claims took place in Pennsylvania, Keasbey's insurance policies were issued in Pennsylvania and PIGA would have had to pay the claim if Keasbey had not been dissolved.

The question of whether Keasbey's residence is relevant depends on what interpretation is given to the phrase, ". . . who at the time of the insured event resulting in loss or liability

was a resident. . . ." T&N argues that we should look at residency at the time of the insured event. At that point in time, Keasbey was still in existence and was a Pennsylvania resident. Therefore, T&N asserts, Keasbey's residence should be sufficient to bring T&N within the Act.

We do not find this argument to be persuasive. The use of the word "resulting" indicates that a loss or determination of liability must occur before a covered claim will exist. If the legislature had intended to provide coverage for persons who had not yet incurred a loss or liability at the time of the insured event, it could have so provided by using a phrase such as "who at the time of the insured event which may give rise to a loss or liability was a resident...." The fact that it did not do so indicates that an actual loss or liability has to be suffered before a person may have a covered claim. Therefore, unless an actual loss or liability is incurred, the person's residence is irrelevant for purposes of the Act.

The asbestos claims did not begin until 1978. After 1969, no claims could be maintained against Keasbey due to Pennsylvania's corporate dissolution statute.[10] Keasbey had not sustained any loss or liability by 1969. Since Keasbey has not suffered any loss or liability, it cannot have a covered claim under the Act and its residence is irrelevant.

---

[10]. 15 P.S. § 2111 (Purdon 1967), repealed and substantially re-enacted by 15 Pa. Cons. Stat. Ann. §1979 (1992).

Again, we note that since PIGA is authorized to pay covered claims, the claims which are significant are those which PIGA is being asked to pay. Therefore, since Keasbey is not presenting a claim, its residence is irrelevant.

C.

Finally, T&N argues that it can be viewed as a Pennsylvania resident for purposes of the Act. As mentioned above, it does not appear that any Pennsylvania court has attempted to interpret the meaning of "resident" with respect to the Act. In Pennsylvania Insurance Guaranty Association v. Charter Abstract Corporation, 790 F. Supp. 82 (E.D. Pa. 1992), the district court held that a corporation could have only one residence. Recognizing that an individual person could only have one residence, the court could not ascertain why a corporation should be treated differently from an individual. Thus, residence would be determined by either the state of incorporation or the principal place of business. The ultimate issue of which location was to be used was not reached because the corporation in question did not meet either test. See also Kroblin Refrigerated Xpress v. Iowa Insurance Guaranty Association, 461 N.W.2d 175 (Iowa 1990).

We find this analysis to be persuasive. It is undisputed that T&N was incorporated in England and has its principal place of business in England. As a result, we find that it is not a Pennsylvania resident under the Act.

T&N argues that since it is subject to jurisdiction in Pennsylvania, it should be considered a Pennsylvania resident. However, the exercise of jurisdiction is not limited to those who are residents of the state which is attempting to assert jurisdiction. As a result, if residence were connected to jurisdiction, it would increase the number of guaranty associations which could be liable, and lead to disputes regarding which association should be liable for the payments. This would defeat one of the purposes of the Act which is to avoid delays in payment.

T&N also argues that since the underlying claimants have brought suit against it because it is allegedly the alter ego of Keasbey, T&N should be able to use Keasbey's residence to come within the Act. It is unclear whether any court has found that T&N is the alter ego of Keasbey to such an extent that the corporate veil should be pierced and that T&N should be held liable for Keasbey's actions.[11] However, the Court of Appeals

_____

[11]. Several courts have addressed the relationship between T&N and Keasbey. See Ward v. Armstrong World Industries, Inc., 677 F. Supp. 1092 (D. Colo. 1988) (T&N is neither the alter ego nor the successor of Keasbey. T&N only owned Keasbey's stock. After the dissolution, Keasbey's assets were sold to companies other than T&N and T&N did not continue in any of Keasbey's product lines.); Kacprzycki v. A.C.&S., Inc., No. 88-34, 1990 U.S. Dist. Lexis 16552 (D. Del. October 31, 1990) (T&N was not the alter ego of Keasbey and could not be held liable for damages allegedly caused by Keasbey); Watkins v. Turner & Newall Ltd., Nos. 84-1742-17 & 86-0087-17, 1988 U.S. Dist. Lexis 8778 (D. Ga. 1988) (T&N is not the alter ego of Keasbey and jurisdiction cannot be found over T&N based on Keasbey's presence in the forum state); and Colcord v. Armstrong World Industries, Inc., No. 84-912 (D. Colo. May 13, 1985) (plaintiff had failed to establish a prima facie showing that T&N so dominated and controlled Keasbey that the corporate veil should be pierced or that jurisdiction

for the Fifth Circuit specifically found in <u>Hargrave v. Fibreboard, Corp.</u>, 710 F.2d 1154 (5th Cir. 1983) that T&N's relationship to Keasbey was not sufficient for Texas to have jurisdiction over T&N through Keasbey.[12]  The Court also found that T&N was not the alter ego of Keasbey.[13]

(..continued)
should be found over T&N due to Keasbey's presence in the forum). <u>But</u> <u>see</u> <u>City of New York v. AAER Sprayed Insulations Inc.</u>, (N.Y. Sup. Ct., November 1, 1990) (T&N's motion for partial summary judgment with respect to Keasbey's products on the basis that Keasbey was not T&N's alter ego denied); <u>City of New York v. AAER Sprayed Insulations</u>, 182 A.D.2d 516, 583 NYS.2d 911 (N.Y. App. Div., April 16, 1992) (affirming January 11, 1991 lower court decision denying T&N's motion for summary judgment because there were material issues of fact regarding whether T&N is the alter ego of Keasbey and whether T&N suppressed knowledge regarding the hazards of asbestos to avoid having to place warnings on its product) and <u>Scharold v. GAF Corp.</u>, No. C-1-84-1062 (S.D. Ohio January 10, 1985) (motion to dismiss based on lack of personal jurisdiction denied because it was unclear that T&N was not Keasbey's alter ego and it was premature to rule on that question).

Three other unreported cases from the Southern District of Ohio reach the same result.  <u>See</u> <u>Herper v. GAF Corporation</u>, No. C-1-84-1028 (S.D. Ohio February 14, 1985), <u>William & Letcher v. Pfizer, Inc.</u>, No. C-1-84-515 (S.D. Ohio February 15, 1985) and <u>Lloyd v. Pfizer, Inc.</u>, No. C-1-84-397 (S.D. Ohio February 15, 1985).  However, it should be noted that these cases did not engage in a separate analysis of the question.  Rather, they entered orders denying the motions to dismiss based on <u>Scharold</u> and <u>Bowman v. Armstrong World Industries</u>, No. C-2-81-1492 (S.D. Ohio, August 8, 1994), a decision which was also relied on by the <u>Scharold</u> court.  In addition, a copy of the <u>Scharold</u> opinion was attached to each of the orders.

[12].     It should be noted that <u>Scharold</u> referred to <u>Hargrave</u> and cited <u>Bowman</u> which held that <u>Hargrave</u> was distinguishable because the law in Ohio was that unless there is a hearing regarding jurisdiction, a plaintiff only needs to make a prima facie showing of jurisdiction.  A hearing on jurisdiction took place in <u>Hargrave</u> but apparently did not take place in <u>Scharold</u> or <u>Bowman</u>.

[13].     A successor liability claim was also brought against T&N but the Court fount that it had been waived.

In addition, T&N alleged in the complaint it filed in the D.C. District Court that it was being sued because it was the former stockholder of Keasbey and exercised such control over Keasbey that Keasbey was T&N's alter-ego. The district court found that T&N was an additional insured under Keasbey's insurance policies because the definition of an "insured" under the policies included stockholders. Therefore, the district court's finding was based on an interpretation of the policies, rather than a determination that Keasbey was T&N's alter ego.

Finally, the record on appeal does not provide any indication regarding the nature of the relationship between T&N and Keasbey beyond the fact that T&N was the majority and then the sole shareholder of Keasbey. In its brief, T&N does not present any arguments establishing the existence of an alter ego relationship. Rather, it merely states that some of the complaints which have been filed against it allege that it is liable because of an alter ego relationship between it and Keasbey. In addition, there is no information regarding what happened after the sale – i.e., how the money realized was distributed, whether T&N retained any liability for Keasbey's past conduct, etc.

Thus, we conclude that the district court did not err in holding that T&N was not itself a resident of Pennsylvania for purposes of asserting PIGA liability.

IV.

We note that the Act does not limit recovery to persons.  Recovery can also be made with respect to any property which is permanently located in Pennsylvania.  Section 1701.103(5)(a)(ii) provides:

> (5)(a) "Covered claim" means an unpaid claim, including a claim for unearned premiums, which arises under a property and casualty insurance policy of an insolvent insurer and is:
>
> *   *   *
>
> (ii) A claim arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth.

Unlike section 1701.103(5)(a)(i), T&N does not have to be a resident of Pennsylvania to recover under section 1701.103(5)(a)(ii) for damage to property permanently located in Pennsylvania.  To the extent that T&N's claims are based on such property, PIGA will be liable.  The question of whether any such property exists should be considered by the district court.  If the district court finds such property, the court must further determine whether an unpaid claim is present with respect to that property, in light of any recovery which might have already transpired.  The district court must consider whether permitting payment with respect to this property will result in a double payment, once to the property owner and once to T&N.  Finally, the district court must scrutinize whether T&N's claim is properly characterized as arising out of a loss or liability to the property itself.  In connection with this, the district court may consider whether the lack of payment is the result of the

insolvency of the insurance company and its failure to pay the monies which remained due under the settlement agreement, and whether T&N's claim is thus transformed into a claim under section 1701.103(5)(a)(i) for which PIGA is only liable if the person bringing the claim is a Pennsylvania resident.

V.

As we have found that T&N may have a covered claim with respect to property permanently located in Pennsylvania, we must turn to the question of the number of covered claims present. The Act states that the maximum which can be paid for a covered claim is $300,000 less a $100 deductible amount. PIGA argues that since T&N agreed to take a lump sum payment under the settlement agreement, it only has one covered claim which is subject to the $300,000 statutory limit less a $100 deductible.[14] T&N counters that the fact that it entered into one settlement agreement is not dispositive because it could have entered into separate settlement agreements for each of the underlying claims and/or insurance polices. To allow it to have only one claim because it settled numerous claims in one agreement would elevate form over substance and be contrary to the policy encouraging settlements. Finally, even if the underlying claims are not treated separately, T&N asserts that it is still entitled to recover the statutory limit for each insurance policy which was

---

[14].      See § 1701.201(b)(i).

issued by American Mutual.  Again, it does not appear that any Pennsylvania court has addressed this question.

The district court based its finding that T&N had a separate covered claim for each of the underlying claimants on the Connecticut Supreme Court case of Connecticut Insurance Guaranty Association v. Union Carbide Corp., 217 Conn. 371, 585 A.2d 1216 (1991).  We find that such reliance was misplaced.

The Union Carbide case arose out of the 1984 disaster in Bhopal, India.  Over 500,000 claims were brought against Union Carbide.  The government of India assumed the right to prosecute all claims arising out of the disaster and all of the claims were consolidated into a single action.  In February of 1989, Union Carbide and Union Carbide of India[15] entered into a settlement with the Indian government.  Union Carbide then approached its insurance companies for reimbursement of the payments it had made under the settlement agreement.  Union Carbide's solvent insurers paid to the limits of their insurance polices.  Three excess insurers whose policies provided for $32,500,000 in coverage became insolvent.[16]  Union Carbide then turned to the Connecticut Insurance Guaranty Association ("CIGA") for payment.

The question facing the Connecticut Supreme Court was whether Union Carbide had only one covered claim which was

_____

[15].      Union Carbide owned 50.9 percent of the stock in Union Carbide of India.

[16].      Even if all of the insurers had paid the full amount of their coverage, Union Carbide would still have been responsible for $217,500,000 under the settlement agreement.

subject to the $300,000 statutory limit or whether Union Carbide had a covered claim for each of the Bhopal victims who had been paid from non-insurance sources under the settlement agreement.[17] CIGA argued that a covered claim is a claim for indemnification under a liability policy, not the separate claims of the tort victims. As a result, Union Carbide had only six covered claims encompassing the six insurance policies which were issued by the insurance companies. The Supreme Court of Connecticut found that under Connecticut General Statute § 38-175, when an insurance company issued a policy, it became absolutely liable once a loss occurred under the policy. In addition, the statute also allowed a tort victim to proceed directly against the insurer if the victim had obtained a judgment against an insured that had not been satisfied within thirty days. In light of both of these factors, the court found that the Bhopal victims had a cause of action against the insolvent insurers in connection with the policies they had issued. In addition, under the Connecticut Insurance Guaranty Act, a covered claim included underlying claimants. The fact that the Government of India had taken control of all of the claims and consolidated them into a single action did not reduce Union Carbide's claim to a single claim. Rather, the statute which authorized the Indian government to consolidate claims created a procedural device which gave the government the power to represent the victims and did not

---

[17]. Since it was undisputed that Union Carbide was a resident of Connecticut, residence was not an issue.

diminish Union Carbide's right of indemnification.  Consequently,
the Connecticut court then affirmed the trial court's finding
that the $300,000 limit applied to each of the underlying claims
and that CIGA must pay the claims presented under the six
insurance policies which were issued by the insolvent insurers.[18]

We find Union Carbide to be distinguishable.  Union
Carbide settled with the underlying claimants.  The settlement
agreement can thus be viewed as the embodiment of each claim
which was filed against Union Carbide.  However, in the present
case, T&N settled with the insurance company.  The settlement
agreement is not the embodiment of the claims filed by the
underlying claimants, as is demonstrated by the fact that
American Mutual agreed to pay up to the policy limits on each of
the policies it had issued.[19]  Payment was not related to the
individual claims which had been filed.  As a result, we find
that in light of the fact that T&N entered into a single
settlement agreement with American Mutual which encompassed all
of its claims against the insurance company, it only has one
covered claim which is subject to the $300,000 statutory limit.
We do not believe that we are exalting form over substance
because T&N agreed to the terms and the form of the agreement.

T&N also requests recovery for its defense costs.  Upon

---

[18].        The court also addressed other issues connected to this
analysis which are not relevant here.

[19].        In fact, under the terms of the agreement, only T&N and
American Mutual have any rights under the agreement.

remand the district court shall also address to what extent, if any, T&N may recover from PIGA for its defense costs.

## VI.

The orders of the district court which were certified to us are hereby affirmed in part and reversed in part. The matter is remanded to the district court for resolution of the property issue and the request for defense costs. Each party to bear its own costs.

RE:   T&N plc, Appellant v. PENNSYLVANIA INSURANCE GUARANTY

      ASSOCIATION, Nos. 93-2011/2012

---

ROSENN, Circuit Judge, dissenting.


        Many persons who charged that T&N was the alter ego of

its subsidiary, Keasbey and Mattison Company (Keasbey), and

therefore responsible for bodily injuries they sustained due to

asbestos exposure, sued T&N.  T&N thereupon filed a declaratory

judgment action against American Mutual in the United States

District Court for the District of Columbia.  T&N's claim arose

out of a policy naming Keasbey as the insured, although Keasbey

had dissolved in 1967 (Maj. Op. at 4) and American Mutual had

written its last policy to Keasbey in 1965.  The court found that

T&N was an additional insured under the policy and directed the

parties to attempt to reach a settlement.  They did, and American

Mutual agreed to pay T&N a significant sum of money, more than

half of which has been paid.

        The settlement agreement explicitly provided that

American Mutual, upon the execution of the agreement, would not

only have no further obligations "based upon, arising out of or

related to any policy of insurance issued to Keasbey by American

Mutual," but that all such policies shall be considered

"exhausted, null and void and of no further force or effect."  I

cannot agree, therefore, that the plain language of that

agreement, solemnly executed in settlement of then pending

litigation in court, can be ignored.  The settlement agreement constitutes a substituted contract, and, therefore, whether it initially had its genesis in the policies written by American Mutual can leave no lingering liability arising under those insurance policies.  I therefore respectfully dissent.

## I.

I agree with the district court and the majority here that Keasbey's residence is irrelevant and that T&N is not a resident of Pennsylvania.  (Maj. Op. at 7).  The majority, however, concludes that the lack of residency does not bar T&N from recovery because the Act does not limit recovery to persons, and permits recovery with respect to property permanently located in Pennsylvania.  Without any discussion at this point of the effect of the settlement agreement on any claim of T&N against American Mutual, the majority decides that if T&N's claim may be "properly characterized as arising out of a loss or liability to the property itself," the district court may find that PIGA is liable if the tort claimant is a Pennsylvania resident.

The majority appears to rationalize that if the original tort claimant was a permanent Pennsylvania resident who would have had a claim against T&N arising out of the asbestos condition of the resident's property, that in itself would suffice to permit T&N to recover, regardless of the settlement agreement between T&N and American Mutual.  The majority offers no explanation and advances no reasons for disregarding the

specific language of the settlement agreement which plainly states that (a) no rights or benefits were conferred upon any person except the parties to the agreement, and (b) all policies of insurance issued to Keasbey and all obligations arising out of or related to any policy of insurance to Keasbey by American Mutual were "exhausted, null and void and of no further force and effect" upon execution of the agreement.

The result of the majority's expansive rationalization is to make the tort claimants the fundament of T&N's claim and the springboard for purposes of T&N recovery; it completely obliterates the settlement agreement. Stated another way, the majority has turned back the clock sometime prior to the execution of the settlement agreement and treats the agreement as if it never existed.

## II.

A federal district court exercising diversity jurisdiction must apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941); American Air Filter Co. v. McNichol, 527 F.2d 1297, 1299 n. 4 (3d Cir. 1975). Accordingly, we must apply Pennsylvania choice of law rules in this case.

Pennsylvania courts generally honor the intent of the contracting parties and enforce a choice of law provision in a contract. Smith v. Commonwealth Nat. Bank, 557 A.2d 775, 777 (Pa. Super. 1989), appeal denied, 569 A.2d 1369 (Pa. 1990). The

Pennsylvania courts have adopted section 187 of the Restatement (Second) Conflict of Laws which provides that:

> (1)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

See e.g., Schifano v. Schifano, 471 A.2d 839, 843 n. 5 (Pa. Super. 1984).  The settlement agreement contains a choice of law provision which provides "[t]his agreement shall be governed by the substantive law of the State of New York."  Therefore, this court should apply New York substantive law to determine the character of the agreement.

A substituted contract is a novation and "[a]n existing claim can be instantly discharged by the substitution of a new executory agreement in its place."  6 Corbin on Contracts, § 1293 (West. Pub. Co. 1962) (footnote omitted); Malanca v. Falstaff Brewing Co., 694 F.2d 182, 184 (9th Cir. 1982).  Novation is the "[s]ubstitution of a new contract, debt or obligation for an existing one, between the same or different parties."  Black's Law Dictionary, 6th Ed. Cent. Ed.

Under New York law,[20] we are faced here with a classic novation and any suits by T&N must be based on the settlement agreement rather than the earlier insurance policies. In Health-Chem Corp. v. Baker, 915 F.2d 805 (2d Cir. 1990), Health Chem Corp. sought a declaration that the settlement agreement negotiated with a former director was invalid and required renegotiation. The court of appeals, applying New York law, affirmed the district court's rejection of the corporation's complaint, and held that "[w]hen the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished, thereby reducing the remedy for breach to a suit on the new agreement." Id. at 811; Wigton v. Rosenthall, 747 F. Supp. 247 (S.D.N.Y. 1990); Flaum v. Birnbaum, 120 App.Div.2d 193, 508 N.Y.S.2d 115 (N.Y.A.D. 4 Dept. 1986).

There is a substituted contract or novation if: (1) there is a valid former contract, (2) the parties agree to a new contract, (3) the parties form a valid new contract, and (4) the parties intend to extinguish the old contract. Flaum v. Birnbaum, 120 App.Div.2d 193. In this case, all the elements of

[20]. The Restatement (Second) of Contracts, § 280, treats a novation more narrowly than does New York and defines it as a substituted contract including as a party one who was neither the obligor not the obligee of the original duty. However, § 279 of the Restatement (Second) of Contracts provides: "A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty."

a novation are met:  (1) there was a valid insurance contract, (2) the parties agreed to a new contract, the settlement agreement, (3) the agreement is a valid contract, and (4) the parties explicitly stated that the new contract extinguished the old contract upon execution of the agreement and would be of no further force and effect.  The settlement agreement, therefore, extinguished any rights that T&N enjoyed under the original policy.  "The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty."  Restatement (Second) of Contracts, § 279(2).

T&N's argument that American Mutual's failure to fulfill the terms of the substituted contract revives the old insurance contracts is contrary to the clear law.  T&N confuses novation with an executory accord without satisfaction.  Cf. Bandman v. Finn, 185 N.Y. 508, 79 N.E. 175 (C.A.N.Y. 1906).

> It is the essence of an accord that the original duty is not satisfied until the accord is performed, a result that is sometimes suggested by use of the term "executory accord."

Restatement (Second) of Contracts, § 281, comment a.  It thus differs from a substituted contract "under which a promise of substituted performance is accepted in satisfaction of the original duty."  Id. comment e.

In National American Corp. v. Fed. Republic of Nigeria, 448 F. Supp. 622 (S.D.N.Y. 1978), aff'd, 597 F.2d 314 (2d Cir.

1979), the court, applying New York law, distinguished an executory accord from a substitute contract.

> An executory accord is, by definition, "an agreement that an existing claim will be discharged in the future by the rendition of a substituted performance." 6 Corbin, Contracts § 1269 at 75 (1962) (emphasis added) . . . In contrast, a substitute contract operates as its name implies -- as an immediate discharge and satisfaction of existing claims in return for the new contract, even though performance is to commence in the future. Should a breach later occur, the creditor is limited to his rights under the substitute agreement.

Id. at 643 (citation omitted).

Thus, under the settlement agreement here, the old contract is dead. The subsequent agreement extinguished the old one and the remedy for any breach thereof is under the superseding agreement. See Northville Inds. Corp. v. Fort Neck Oil Terms. Corp., 474 N.Y.S. 2d 122, aff'd, 64 N.Y.2d 930, 488 N.Y.S.2d 648, 427 N.E.12d 1102 (1985). Accordingly, the only remedy for a breach of the substituted contract is a suit on that contract.

### III.

Therefore, in response to the questions certified by the district court, I would hold as to question 4 that it erred in holding that T&N could rely on the underlying claims resolved in the settlement agreement, and the residence of the underlying claimants to meet the residency requirement of the Act. In response to question 5, I would similarly hold that it erred in

holding that T&N could rely on the claims represented in the settlement agreement and the location of property which sustained loss to meet the residency requirement of the Act.  Under my view of the case, there is no need to reach the issues raised in questions 6 and 7.  I would answer the first three questions in the affirmative.